Paul Dennis **NEWSOM**, Appellant,

v.

**STATE** of Alaska, Appellee.

No. 1726.

Supreme Court of Alaska.

July 20, 1973.

Herbert D. Soll, Public Defender, John. W. Abbott, Susan Burke, Asst. Public Defenders, Anchorage, for appellant.

John E. Havelock, Atty. Gen., Juneau, Seaborn J. Buckalew, Jr., Dist. Atty., J. Randall Luffberry, Asst. Dist. Atty., Anchorage, for appellee.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER, and FITZGERALD, JJ.

## OPINION

FITZGERALD, Justice.

Appellant, Paul Dennis Newsom, was convicted after trial by jury on four separate counts including the crime of rape. The trial judge sentenced him only on the rape conviction to fifteen years, without eligibility for parole until one-third of the sentence is completed.[1] Newsom now appeals from the judgment of conviction and from the sentence.

### I

Appellant advances two contentions of error in his appeal from the judgment of conviction. He claims the State was erroneously allowed to introduce evidence of appellant's bad character including specific acts of misconduct. Second, he claims the trial court permitted the district attorney to conduct an improper cross examination and subsequent pursuit of collateral evidence impeaching appellant, who testified on his own behalf.

According to the testimony of Mrs. B, the complainant, she and appellant had become acquainted before October 30, 1971, the time when the offense is said to have occurred. She was also acquainted at that time with appellant's father, Warren Thomas Newsom.

About two weeks before the 30th of October, Mrs. B was having coffee at Flapjack Jim's, an Anchorage restaurant. Her brother-in-law, an employee of the restaurant, came to her table to visit with her. They were later joined by Dennis Newsom and his friend and by Warren Newsom, who, as it turned out, was also employed at Flapjack Jim's.

The complainant and appellant left the restaurant in Mrs. B's car to look for a party. After considerable driving about, they returned to Flapjack Jim's. Arrangements were made to meet at Flapjack Jim's on Friday evening, October 29, 1971. When the complainant arrived at Flapjack Jim's that Friday night, she found her husband in the restaurant.[2] Appellant had not yet appeared so she departed shortly thereafter in her husband's company to visit at her brother-in-law's residence.

She arrived at her own residence about 1:00 a. m. on the morning of October 30. At about 7:00 a. m. she was awakened by a knock on the door. Thinking it was one of her friends or her husband, she shouted out to the visitor to enter. Appellant entered the housetrailer. He explained that he had arrived at Flapjack Jim's about 9:30 p. m. the previous evening and so missed the appointment.

There ensued a conversation between Mrs. B and appellant. At this point the accounts of what followed reach sharp and irreconcilable conflict. According to Mrs. B, appellant told her he had quit his job but strangely enough, he offered to give her a substantial sum of money. Because of the turn of the conversation, the complainant became concerned and, she says,

---

1. AS 33.15.230(1) provides for fixing eligibility for parole at time of sentencing.

2. Mrs. B was living apart from her husband, having separated from him at an earlier date.

tried to give appellant the idea that she wished him to leave. Finally, he did tell her that he was leaving, but before departing he went to the bathroom. When he returned to the living room, he held a knife in his hand. Appellant disclosed to Mrs. B that he intended to rape her. He took her by the shoulder, pulled her from the couch in the living room to the kitchen, and pushed her into the bedroom of the trailer. There he forced her down on the bed and put the knife to her throat. He said, "I'm gonna slash you." Mrs. B rolled to her side and covered her face with her arm saying, "Go ahead and slash me, I don't want to make love with you." Appellant slapped her violently across the face with his right hand. Her clothing was removed and she was raped.

Police officers obtained a statement from appellant shortly after the time of his arrest. According to his statement, at the time he arrived at Mrs. B's residence at about 7:00 a. m., he was invited in. When appellant entered the trailer, the complainant was not in sight, and he began searching the premises for her. As he entered the bedroom, she came out of the bathroom and threw her arms around him and started to cry, saying, "Where's my baby, where's my baby?" Her face was swollen and she had a cut on the side of her mouth. She was hysterical. At this point, according to appellant's statement, he undertook to render her assistance to calm her down. After helping her, as he could, he left the trailer and returned home.

The first defense witness to testify at the trial was Warren Newsom, the father of appellant. He said that on the morning of October 30, 1971, he drove appellant to Mrs. B's trailer. After leaving appellant, he continued to his home where he went to bed. At about 9:30 a. m. he was awakened by appellant, who had entered his father's bedroom. He told his father that Mrs. B was in trouble, that she had been beaten up.

The senior Newsom further testified that he then got up from bed, followed his son to his room and questioned him about the matter. He asked appellant why he had not called the police or taken some action of that sort. Appellant responded that he was afraid he would get in trouble.

During direct examination, Warren Newsom was questioned extensively about appellant's out of court, self-serving statements to him. His testimony provided the jury with the appellant's exculpatory version of the facts, and was offered to establish that appellant had, upon his arrival at Mrs. B's trailer, found her to have been beaten up. This hearsay testimony contradicted Mrs. B's testimony that she had in fact been raped by appellant.

In cross examination, the State pursued three lines of questioning which appellant now argues were improper and prejudicial. At one point, the prosecutor asked the father, "Would you characterize your son as a truthful person?" Mr. Newsom replied, "No, sir." No objection was entered by defense counsel until the prosecutor followed that answer with the question, "So you really don't know whether he raped [Mrs. B] or not?" At this point, the defense objected that the question called for a conclusion on the part of the witness, and conceded, "If the question is rephrased to ask him if he believes his son committed the rape, I'll withdraw my objection." The court overruled the objection and the prosecutor continued, first eliciting a concession from the witness that he did not know whether the appellant's story was true, and then obtaining an affirmative response to the question, "He very well could have raped her, couldn't he?"

A second question was then asked by the prosecutor, "Along the same lines, didn't you tell the policeman afterwards that Dennis had a problem?" Defense counsel immediately objected that the question was irrelevant. The jury was dismissed and defense counsel noted to the judge that a preclusion order had been entered stipulating that no reference was to be made to any juvenile matters in appellant's personal history. A lengthy discussion ensued con-

cerning whether the question was directed toward the juvenile record or toward a general opinion by the father. The prosecution agreed not to pursue the line of questioning any further.

On recross examination the prosecutor asked appellant's father, "Isn't it also correct though that you know that he [appellant] tells an untruth on occasion?" The defense objected on grounds that the question had been asked and answered previously. This objection was overruled and the witness answered, "Yes, he's told untruths before, yes." The prosecutor then asked if these untruths had been told in "[e]xtreme serious matters." Objection was taken to the phrasing of the question. It was then restated as "the things in the more important affairs of life?" The witness then answered in the affirmative.

Appellant urges on appeal that the above cross examination was character evidence impeaching the truth and veracity of appellant prior to his having taken the stand in his own defense, putting pressure on him to take the stand to reconstruct his good character, and hence violating his Fifth Amendment right not to incriminate himself.

The State responds that appellant waived his right to appeal on this ground by failing to so object at the trial. Defense counsel did object at trial. However, the grounds for objection differ from those arguments presently made on appeal.

■ While Alaska R.Crim.P. 46 provides that under most circumstances, the objecting party should state his objection and the grounds for this objection at the time of the ruling or order, Alaska R. Crim.P. 47(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought

to the attention of the court." In Hammonds v. State, 442 P.2d 39, 43 (Alaska 1968) we said,

> The meaning of Crim.R. 47(b) is that we may consider questions raised for the first time on appeal if necessary to effect substantial justice or prevent the denial of fundamental rights.

In *Hammonds* we also distinguished between "a technical failure to object" and an intelligent waiver of a substantial right. We view the failure to specify the exact grounds for objection in this case as having been such a "technical failure." The argument on appeal, that appellant was deprived of his right not to incriminate himself, raises a question of a "substantial right" under Rule 47(b) which cannot be ignored for the mere technical failure to raise that exact objection below. If the evidence introduced by the prosecution was in error, the appellant's freedom to choose whether he wished to take the stand may have been improperly influenced.[3] We, therefore, reach the merits of the issue of whether the cross examination of the witness prematurely brought the character of the appellant into question, thus compelling him to take the stand in his own defense.

■ We find, however, that the line of questioning by the State was properly directed at impeachment of the witness rather than at character evidence challenging the truth and veracity of appellant. The father of the appellant took the stand as a defense witness and offered appellant's exculpatory version of the facts, directly contradicting the testimony of the prosecutrix. The testimony elicited from him on direct examination by defense counsel amounted to hearsay statements of appellant's declarations shortly after the alleged commission of the crime. On cross examination

---

3. *See*, United States v. Modern Reed & Rattan Co. et al., 159 F.2d 656, 658 (2d Cir. 1947). A prior conviction was introduced by the prosecution before the defendant took the stand. With reference to the fact that the defendant subsequently testified on his own behalf, the court observed, "[A]bsent the initial error, it is not clear that the defense would have followed this pattern." The court concluded, "His freedom of choice as to such issues may not be taken from him by error previously committed in the trial."

the prosecutor challenged that testimony by showing that while the father was prepared to believe his son's statement the morning of the crime, he would admit his son's general lack of truthfulness on other important matters.

 In Smith v. State, 431 P.2d 507 (Alaska 1967), we were confronted with a similar issue where cross examination properly intended to impeach the witness touched precariously on the verge of impermissible testimony. We applied the test that the permissibility of such questioning "depends upon an advised judgment as to which of the two objectives is the primary one sought to be accomplished." [4] When a situation arises where evidence is relevant to one issue but not admissible for policy reasons on another issue, the test of admissibility will require a balancing of the probative value against the possible prejudicial effect. The prejudicial effect, however, may largely depend upon the form and manner of the examination. Where alternative forms of questioning are available, that alternative form which minimizes the prejudicial effect should be chosen. On such occasion the trial judge should exercise his close supervision.

We find that the questions in the instant case were designed to impeach the testimony of the witness, and that these questions were phrased in a sufficiently moderate fashion which would accomplish the legitimate purpose of impeachment without lapsing into premature and improper impugning of the character of appellant. While some incidental evidence of appellant's character may have emerged from the impeachment, we do not find that factor to be error under circumstances where the witness was called by the defense, and where direct examination brought appellant's credibility into issue. The impeachment of the father's general confidence in appellant's veracity was carefully fashioned by the prosecution in a manner which avoided undue prejudice and was, under such circumstances, permissible.

With regard to the cross examination asking whether appellant "had a problem," we observe that the prosecution withdrew the question, and no further testimony on this subject was elicited. Moreover, the question was not so specifically directed toward any juvenile record which appellant may have had so as to violate the pretrial stipulation. The question, so far as it went, was not an inquiry into a specific act of misconduct, nor was it a protracted inquiry designed to discredit the character of the appellant.[5]

In a second issue raised on this appeal, appellant urges that two lines of questioning developed by the State on cross examination of appellant and in rebuttal testimony were an improper pursuit of collateral proof which prejudiced the jury by confusing the relevant issues at trial.

During direct examination of appellant, his own counsel asked him to relate the series of events that took place between 7:30 a. m. and about 3:00 p. m. the day of October 30, 1971. Appellant included in his testimony the fact that he was arrested, taken to the police station, and interrogated. On cross examination the prosecutor focused on the arrest and subsequent questioning at the police station. He brought out claims by appellant that an officer displayed a gun at the time of arrest, and that two statements waiving constitutional rights may have been signed that day by appellant.

4. Smith v. State, 431 P.2d 507, 509 (Alaska 1967).

5. *See*, Freeman v. State, 486 P.2d 967, 981 (Alaska 1971) where we found that details of a prior conviction were erroneously admitted. We noted in the context of a finding of plain error that "the error . . . was not limited to an isolated question or to an improper reference made in passing by the state. Rather, it took the form of a protracted and insistent cross-examination which brought to the surface numerous alleged details of [appellant's] prior offense." Contrary to the argument of appellant, the *Freeman* case is quite distinguishable from the case presently before us.

■ While neither the circumstances of the arrest nor the waiver of constitutional rights were issues at the trial, we do not find that in this case they were improper lines of cross examination. Appellant had testified on direct examination concerning the circumstances of his arrest and the subsequent interrogation. Alaska R.Civ.P. 43(g)(7) made applicable to criminal trials by Alaska R.Crim.P. 26(a) provides that "[a]n adverse party may cross examine a witness as to any matter stated in the direct examination or connected therewith . . . ."

■ With regard to the call of rebuttal witnesses to impeach appellant's testimony on possible collateral matters, we note the fact that no objection was made by appellant during the examination. We cannot find a potential impingement of such a substantial right under Alaska R.Crim.P. 47(b), which would require this court to take notice of a possible inadmissible proof not objected to below.[6] We, therefore, do not reach the merits of the argument of appellant.

## II

■ Relying upon our decision in State v. Chaney, 477 P.2d 441, 443 (Alaska 1970) that this court will consider "the sufficiency and accuracy of the information upon which [sentencing] was based," appellant urges that sentencing occurred without an adequate psychiatric evaluation of the defendant. Appellant argues that the only psychiatric report in the case was made prior to trial for the limited purpose of de-

termining his competency to stand trial; that the evaluation contains little information not found in the presentencing report; that the psychiatric portrayal of appellant is found in other psychiatric evaluations of other clients of the Public Defender's Office in almost exactly the same form; and that the court did not inquire into appellant's potential for rehabilitation.

An adequate psychiatric evaluation at the time of sentencing is extremely helpful to the sentencing judge. That is not to say, however, that a psychiatric evaluation is indispensible or necessary. More important than any single form of information about the convicted defendant is the general sufficiency and accuracy of that information in terms of the objectives of sentencing review.[7] In Robinson v. State, 484 P.2d 686 (Alaska 1971), we reversed a sentence not only because the trial judge did not have a psychiatric evaluation at the time of sentencing, but also because "the trial judge entertained the firm conviction that [appellant] was beyond the reach of any rehabilitative efforts."[8]

The instant case is quite distinguishable. The absence of a psychiatric evaluation in aid of sentencing is more than compensated for by the exhaustive pre-sentence report, the clearly articulated awareness of the judge of the rehabilitative function of the law, and the strong concern of the judge that appellant receive psychiatric treatment. Immediately following sentencing, the court noted,

The one thing I am sure of, and that is . . . that he certainly needs treat-

---

6. See, Kugzruk v. State, 436 P.2d 962, 963–964 (Alaska 1968); Gilley v. City of Anchorage, 376 P.2d 484, 485 (Alaska 1962); Rank v. State, 373 P.2d 734, 736 (Alaska 1962).

7. In State v. Chaney, 477 P.2d 441, 443 (Alaska 1970) we noted the following objections of sentencing review:

(i) to correct the sentence which is excessive in length, having regard to the nature of the offense, the character of the offender, and the protection of the public interest;

(ii) to facilitate the rehabilitation of the offender by affording him an opportunity to assert grievances he may have regarding his sentence;

(iii) to promote respect for law by correcting abuses of the sentencing power and by increasing the fairness of the sentencing process; and

(iv) to promote the development and application of criteria for sentencing which are both rational and just.
(Footnote omitted).

8. Robinson v. State, 484 P.2d 686, 689 (Alaska 1971).

ment, some psychiatric treatment. . . . I am concerned. I don't want him to just lie around in jail.

The judge then issued an order requiring the Division of Corrections to advise him on the program they find for appellant. He further elaborated,

And I expect them to have some program that will lead to an improvement of the situation, not to a breakdown of this man's future.

A subsequent report to the sentencing judge two months after sentencing indicates a unanimous recommendation by the classification committee of the Southcentral Regional Correctional Institution that appellant be placed in a federal institution which can ensure the psychiatric treatment and rehabilitation which he requires. Appellant has since been transferred to the federal penitentiary at McNeil Island, Washington.

This measure of concern for the rehabilitative treatment of appellant sufficiently distinguishes the *Robinson* case, and sufficiently ensures the proper objectives of sentencing. We do not find the absence of a psychiatric evaluation in aid of sentencing to be in every case grounds to set aside the sentence.

Finally, appellant urges that the trial court erred by imposing sentence before his counsel had sufficient time to review the presentence report for inaccuracies. Appellant's counsel noted in his argument to the court that he had only a few minutes to read the presentence report before the beginning of the sentencing hearing. Nonetheless, he told the trial judge at the commencement of the proceedings that the defense was ready, and he did not object at any time to the hearing going forward. We find no "plain error" depriving the appellant of a substantial right, which would cause us to notice the issue on appeal.[9]

While a sentence of fifteen years without eligibility for parole until one-third

of the sentence is completed, is an unusually long period of incarceration, we do not find it excessive in this case. Appellant has a history of sex offenses, and has served lesser periods of incarceration as a juvenile apparently without measurable rehabilitation being accomplished.

The judgment of conviction is affirmed.

---

9. Robinson v. State, 492 P.2d 106, 107 (Alaska 1971).