Sidney Lee VAIL, Appellant,

v.

STATE of Alaska, Appellee.

Timothy TAYLOR, Appellant,

v.

STATE of Alaska, Appellee.

Nos. 3309, 3382.

Supreme Court of Alaska.

Sept. 7, 1979.

R. Stanley Ditus and Cynthia F. Covell, for appellant Vail.

Sue Ellen Tatter, Asst. Public Defender, and Brian Shortell, Public Defender, Anchorage, for appellant Taylor.

W. H. Hawley, Jr., Asst. Atty. Gen., Anchorage, and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

Before RABINOWITZ, C. J., and CONNOR, BOOCHEVER, BURKE and MATTHEWS, JJ.

## OPINION

CONNOR, Justice.

Timothy Taylor and Sidney Lee Vail appeal from convictions of first degree murder.[1]

On the morning of September 21, 1975, the body of Michael Sickles was discovered in a wooded vacant lot near downtown Anchorage. The corpse bore multiple stab wounds. It was later established at trial that these wounds were inflicted by two different knives. The police found a knife and the decedent's wallet near the scene of the crime. Further investigation by officers of the Anchorage Police Department led them to focus on two suspects, Timothy Taylor and Sidney Vail.

### Taylor's Interrogation and Confession

Taylor was serving a thirty-day sentence in the Kodiak jail on an unrelated misdemeanor charge when he was questioned regarding the murder of Sickles. On the evening of January 12, 1976, Officer Bailey of the Kodiak Police Department received a call from his superior, Sgt. Carter, requesting that Bailey, who was assigned to the midnight shift of duty, interview Taylor or one of his cellmates, Sidney Vail, about the homicide. Taylor and Vail habitually stayed up at night, playing cards, and slept during the day. Bailey knew Taylor well and had interviewed him regarding other crimes on at least six prior occasions, including three felony investigations during the month preceding this particular evening. On each of these occasions, Taylor had waived his Miranda[2] rights and spoken freely with Bailey.

Bailey arrived at the Kodiak police station at 11:30 p. m. According to Bailey's testimony at the suppression hearing, he found Taylor awake and standing at the door of his cell. It was Bailey's practice to visit with Taylor every night to talk about "anything from the weather to . . .

just about anything." On this particular evening, Bailey took Taylor out of his cell, got some coffee and conducted him into the dispatch room. Bailey gave Taylor a standardized Miranda waiver form which Taylor initialled. For the first ten minutes the two discussed the weather and conditions in Kodiak. Then Bailey told Taylor that he had been asked to talk to him and Vail about a stabbing homicide in Anchorage. Bailey added that officers from the Anchorage Police Department would be over to talk to Taylor about that crime in the next day or so. Taylor replied that he knew nothing about any stabbing and that he didn't want to talk about Vail. Then Bailey told Taylor that as far as he knew, Taylor was going to be charged with first degree murder by the Anchorage police. At that point, according to Bailey, Taylor started crying and confessed that he and Vail had stabbed Sickles. After Taylor made this statement, Bailey had him write it down and then followed up with written questions which Taylor answered in writing. Taylor cried intermittently throughout the interview. The interview was not taped. The questioning was concluded at 3:40 a. m. on the 13th of January. Taylor requested and was allowed to telephone his parents. Bailey called Sgt. Carter to inform him of Taylor's statement and Carter in turn called the Anchorage Police Department. Taylor was returned to his cell.

### Vail's Interrogation and Confession

At approximately 12:45 a. m. on January 13, 1976, after Taylor had been taken from the cell which he shared with Sidney Vail and Chris Hoover, Kodiak police officer James Monroe came to talk to Vail. Monroe claims that Vail was awake, but Vail and Hoover dispute this. Monroe and Vail had known each other for seven or eight years and Monroe had interviewed Vail numerous times in the past in connection with

---

1. Timothy Taylor and Sidney Vail were tried jointly for the murder of Sickles. The cases were not consolidated on appeal. However, for the sake of clarity and brevity, the issues underlying both appeals will be discussed herein.

2. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

other criminal investigations. On each of those occasions, Vail never invoked his *Miranda* rights to remain silent.

On this particular evening, Monroe read Vail his *Miranda* rights, had Vail initial the *Miranda* form used by the Kodiak police and told Vail that he was investigating a stabbing which the Anchorage police believed involved Vail. When Vail responded that he knew nothing about the incident, the questioning terminated, and Monroe put Vail in a single party cell at around 12:55 a. m.

Sometime between 1:00 a. m. and 3:15 a. m., Monroe returned to the cell where Vail was being held and told him that Taylor had confessed to the stabbing and had implicated Vail. Vail again said that he knew nothing about it and Monroe left him. At 3:15 a. m., Monroe went back to Vail's cell, repeated that he was now implicated in the stabbing by virtue of Taylor's statement and advised him to make his own statement. He told Vail that he would probably be charged with first degree murder by the Anchorage police, but that it could be a lesser charge depending upon what Vail said. Hoover overheard this conversation and testified at the suppression hearing that Monroe told Vail things could go easier if he, Vail, talked. Monroe did not re-read the *Miranda* warnings to Vail on this last occasion, but testified that at that time he showed Vail the *Miranda* warning form which Vail had read and initialled at the beginning of the 12:45 a. m. meeting. This time, Vail agreed to talk.

Vail admitted his participation in the stabbing, and at the conclusion of the interview, which lasted for about an hour and fifteen minutes, Vail agreed to take Monroe to his mother's apartment, where he had been living, and produce the knife that he had used. Vail signed a search consent form prior to the search.

Monroe, Vail, and Sgt. Carter got into a patrol car and drove to Mrs. Vail's home. They arrived there at about 4:30 a. m. Monroe knocked at the door and Mrs. Vail, who was dressed for work, answered. Monroe told her that Vail had confessed to a homicide and that they were there because Vail had agreed to give them his knife. Mrs. Vail did not object, and Vail went inside, got the knife, and gave it to Monroe. They arrived back at the jail at 4:45 a. m. and Monroe put Vail back in the single cell.

Later that day, Investigator Sherbahn of the Anchorage Police Department arrived in Kodiak. He talked to both Taylor and Vail, separately, showed each of them the statements they had made and signed earlier that morning. At that time, neither Taylor nor Vail contradicted those statements. Sherbahn taped his interviews with both defendants. Both Taylor and Vail told Sherbahn that they had described the events on the night in question to a mutual friend. Terri Heath, with whom they were living at that time. When Sherbahn returned to Anchorage on January 15th, he interviewed Heath.

*Proceedings Before the Grand Jury*

A grand jury was convened on February 4, 1976, in Anchorage. The District Attorney presented only two witnesses, Investigator Sherbahn and Terri Heath. Sherbahn first described the scene of the crime and the evidence that had been found. He then testified that he had interviewed Vail and Taylor in Kodiak late in the day of January 13, 1976, that they had confirmed the statements which they had earlier given to the Kodiak police, and he then read those statements to the grand jury. Taylor's statement read as follows:

> On the night in question Sid and I were at a party. We had drank about a half gallon of Tequilla and we were feeling rowdy so we went looking for a fight and met this guy and we stepped into some bushes to smoke some pot and this guy started telling us that he was a big dealer and how he had this great amount of pot downtown and Sid said he was a liar and the guy got pissed and pulled a knife and started—and got stabbed—Sid got—just a minute. The guy pulled a knife and I got stabbed in the arm and then Sid stabbed the guy and the guy started to run and I went after him and stabbed

him in the back a couple of times. He was getting away so I threw my knife at him and lost it. Then I caught the guy and was hitting and kicking him and Sid came up and stabbed the guy and then Sid just went crazy and started laughing real strange and stabbed the guy and then we left.

Vail's statement was:

Me, Tim Taylor, and Mike Gorman (ph) left the house and walked down Fireweed Street where we left Mike on a corner where he passed out. Me and Tim went to the Gold Rush Hotel where we met the guy. We started downtown. He was telling us that he had a lot of pot. When we stopped off to smoke some we found out he didn't have any. I called him a liar and he hit me. Then Tim probably jumped him. He had a knife so I pulled mine. Tim said he got stabbed and the guy started running. Tim was chasing him. Tim said he stabbed him in the back and then threw the knife at him. That's when Tim lost his knife. Tim tackled him and I started stabbing him. Then we went to look for Tim's knife and we couldn't find it, so we went back to the house that we were staying at.

The tape recording which Sherbahn made of his conversations with Vail and Taylor had not been transcribed and was not played for the grand jurors.

Using diagrams which Taylor and Vail had made, Sherbahn illustrated the events of the early morning hours of September 20, 1975, which resulted in Sickles' death.

Heath told the grand jury that Taylor and Vail were living with him and Wendy Rayburn in September of 1975. His testimony can be summarized as follows: On the night of September 19, 1975, there was a tequilla party at Heath's house. Present were Heath, Vail, Taylor, Mike Gorman, Wendy Rayburn, and two others. Taylor, Vail and Gorman left the party around 1:00 a. m. Taylor and Vail were drunk and their speech was slurred. They came back to Heath's house two or two and one-half hours later and called Heath into the bathroom. Taylor had a narrow wound about 1

to 1½ inches deep on his right forearm, which was bleeding. Vail was washing off a knife in the bathroom sink.

Taylor told Heath that he and Vail had met three natives as they were going into the woods to smoke some marijuana. Once in the woods, one of the three jumped Taylor, who started fighting back. Taylor stabbed him and the man ran off. Vail told Taylor to "get him" and Taylor pursued him, throwing his knife and hitting him. Taylor told Heath that Vail "finished him" by stabbing him. Taylor lost his knife in the fight and was unable to find it in the woods. Heath told the grand jury that later that night, Vail and Taylor discussed the stabbing again with Wendy Rayburn.

The grand jury indicted Taylor and Vail for first degree murder.

### Pre-Trial Proceedings

Taylor and Vail's motions to suppress the confessions were denied. The superior court found no *Miranda* violations. Motions to dismiss the indictment for insufficiency of the evidence were also denied. Taylor withdrew his motion for a separate trial and Vail's motion for severance was denied. Various other pre-trial motions were made and they will be discussed below.

Plea negotiations resulted in an offer by the state to reduce the charges to manslaughter and to recommend a sentence of fifteen years. This offer was made on the condition that both defendants accept it. Vail but not Taylor was willing to plead. On June 25, 1976, the superior court accepted Vail's guilty plea but gave the state time to petition this court for review on the question of whether a judge may participate in plea negotiations over the objection of the state. The state filed its petition, and the proceedings were stayed pending review. Our determination in *State v. Carlson*, 555 P.2d 269 (Alaska 1976), granting relief in the nature of prohibition, was announced on October 15, 1976. Our order indicated that the mandate would issue on October 25, 1976, and the superior court set that as the trial date. Both defendants

moved for a dismissal pursuant to the Criminal Rule 45 speedy trial requirement. The court denied the motions and held that Criminal Rule 45, insofar as it charges advisory periods on pre-trial motions in excess of thirty days against the state, did not apply to petitions for interlocutory review addressed to the Alaska Supreme Court.

### Jury Selection

Jury selection commenced on November 16, 1976. The jury pool was depleted and six additional jurors who had been excused from the courtroom of District Judge Vochoska, pursuant to challenges for cause or peremptory challenges, were sent into Judge Carlson's courtroom. At the time that these additional jurors were brought in both defendants had exercised all of their peremptory challenges. Three of these jurors were seated. Defendants' motion to disqualify these jurors as selected in violation of the statutory random jury selection process was denied.

### The Trial

In his opening statement, the prosecutor referred to certain admissions made by the defendants: he told the jury that Taylor's friend would testify that Taylor said he had run his knife into the victim "up to the hilt", that another friend, Wendy Gorman (nee Rayburn) would testify that she heard Taylor and Vail laughing over erroneous press accounts of the homicide, and that Terri Heath would describe how Vail told him about "steam" and strange odors which emanated from the victim's body when the two returned to the scene of the crime to look for Taylor's lost knife.

Taylor moved to exclude these statements on the ground that the state had failed to provide the defense with these admissions pursuant to their Rule 16 motions for discovery. The state argued that Rule 16 applies only to admissions made by the defendants to the police. The trial court denied the motion to exclude. The admissions were introduced as part of the state's case-in-chief. Officer Monroe of the Kodiak Police testified to Vail's jailhouse

statement and read it to the jury. Investigator Sherbahn testified to his conversation with Vail in the Kodiak police station and the jury heard the tape recording which he had made. Dr. Rogers, a pathologist who performed the autopsy on Sickles, testified about the numerous wounds and described the cause of death as loss of blood. Dr. Rogers was unable to point to any one wound as the fatal blow. He testified that he did not find any "hilt" marks on the body.

At the conclusion of the state's case-in-chief, both defense counsel moved for a judgment of acquittal, arguing that the evidence failed to show premeditation and deliberation. The motion was denied. The court indicated that Taylor could be found guilty of first degree murder as an accomplice to premeditated murder committed by Vail.

Taylor's lead-off witness was Dr. Besant-Matthews, a pathologist who testified that had the autopsy been more rigorous, the location and angle of infliction of the fatal wound could have been determined.

Taylor took the stand in his defense. He testified as follows: He had been at a tequilla party. He was drunk and feeling "careless, carefree, loose, loud, rowdy" when he left the party with Vail and Mike Gorman. Gorman got sick near the Westerner Bar and sat down. Vail and Taylor continued walking. Near Northern Lights and "C" Street, they met Michael Sickles, who appeared drunk to Taylor. According to Taylor, Sickles invited Vail and Taylor to smoke some marijuana in the bushes. Sickles stated he had a great amount of marijuana downtown, and Sidney Vail responded that Sickles was a liar. A fight began between Vail and Sickles and apparently Vail was knocked down. Sickles came toward Taylor with a small knife. When Taylor lifted his arms to protect himself, Sickles stabbed him in the right forearm. Vail then stabbed Sickles in the stomach at least once. The victim started to run and Taylor stabbed him in the lower back as he ran past. Taylor stated he was "mad" because Sickles had stabbed him in the arm.

Taylor threw a knife at the victim, who was by then approximately eight to ten feet away. The knife may have penetrated, but as Sickles was running he threw off his jacket and the knife fell away. Taylor tackled Sickles and, while the two were fighting, Vail came up and started stabbing Sickles in the chest and stomach. At least one of Vail's wounds struck Sickles in the back.

Taylor testified that he became frightened of Vail during the stabbing because Vail did not seem to be in control of himself. Vail was laughing strangely and kept saying "he won't die." Finally, Taylor said "let's go" and Vail stopped stabbing the victim. Unable to find Taylor's knife, the pair left the scene and returned to their home where they told Terri Heath what happened.

Taylor told Heath that three people, rather than just Sickles, were involved in the initial altercation in order "to make the odds [look] even." Heath drove Taylor and Vail back to the lot to search, unsuccessfully, for Taylor's knife. Taylor denied ever stabbing Sickles "to the hilt" or ever telling anyone that he had done so. He said that he did not intend that Sickles die; he only wanted to beat him up.

Taylor's statements to Officers Carter and Bailey in Kodiak, with the appended questions and answers and his diagrams were placed in evidence during cross-examination. The tape recording of Taylor's statement to Sherbahn was also played for the jury.

Vail asserted an insanity defense. He did not take the stand. Dr. Joseph Bloom, a court appointed psychiatrist, testified that at the time of the stabbing Vail was suffering from a dissociative reaction which, combined with the effects of alcohol, caused him to lose control of his rational faculties so that he lacked substantial capacity to conform his conduct to the requirements of the law.

On rebuttal, the state called Dr. Olivier, also a court appointed psychiatrist, who testified that he found no evidence of any major mental illness at the time of the offense, and that based on the data made available to him he was unable to diagnose the existence of a dissociative reaction.

On December 7, 1976, after a fourteen day trial, the jury found both defendants guilty of first degree murder.

### Sentencing

A sentencing hearing was held on February 8, 1977.

Taylor called several witnesses. Kodiak Police Officer Bailey testified that in his opinion Taylor could probably be rehabilitated, and Jeanne Slack, the probation officer who prepared the pre-sentence report, informed the court that Taylor did not pose the kind of threat to society which required that he be locked up for the rest of his life.

Vail did not present any testimony at this hearing.

The court found that the prognosis for treatment and rehabilitation of both defendants was poor, and that they manifested an "utter disregard for the integrity of the individual." In reaching these conclusions, the court relied upon evidence relating to an indictment of Taylor and Vail for an assault with a dangerous weapon which occurred subsequent to the death of Sickles.[3] This indictment had been dismissed twice. At the time of sentencing, the second dismissal was on appeal.[4]

Both Taylor and Vail were sentenced to life imprisonment.

Defendants, in their separate appeals, raise a total of twenty four issues. Where appropriate, we have consolidated the discussion on issues jointly raised.

### I.

The defendants assert that the manner of procurement of additional ve-

3. The court had before it the grand jury transcripts and the defendant Taylor's confession to this assault charge, and specifically took into account the subsequent criminal charge.

4. We subsequently reversed the second dismissal of the indictment. State v. Taylor, 566 P.2d 1016 (Alaska 1977).

niremen was contrary to the statutory method for selection of an impartial jury. After the original panel was exhausted, six additional jurors who had been excused from another trial, either for cause or peremptorily, were summoned from the courtroom of District Court Judge Vochoska. Defendants had already used all of their peremptory challenges. Three of those were seated on the jury in this case. One deliberated as the forewoman. Defendants claim that it was improper to draw additional jurors who had been dismissed from another panel, because it deprived them of the right to a fair and impartial jury. They argue that this constitutes reversible error.

The statutory scheme for civil jury selection, made applicable to criminal cases by AS 12.45.010, provides for a random selection process to "assure a fair and impartial drawing" of a panel. A list of those eligible to serve on jury duty is transmitted to each superior court judge. The court clerk places the names into a jury box and then draws "as many names as are ordered by the court" to fill a panel. AS 09.20.-060–.070. If the panel is exhausted, the clerks shall secure additional jurors by drawing other names from the jury box. AS 09.20.080. Every trial jury shall be empanelled in this manner "unless the court directs otherwise." AS 09.20.090. Failure to substantially comply with the above procedures "which prejudices the rights of a party" is reversible error. AS 09.20.040. We must, therefore, determine whether there was substantial compliance with the statutory selection process.

The gist of the claim of error here is that any additional jurors should have been secured only by drawing names from the box in which the names of jurors on the general panel are contained.

No claim is made that any of the six jurors in question was improperly selected for the panel in the other trial. It appears that the jury clerk, upon receiving the request for additional jurors, sent all of the jurors excused from the other trial. Of those, two had been peremptorily challenged in the other trial by the prosecution, one had been peremptorily challenged by the defense, the status of one was unknown, and two had not been called. It cannot be said that this group was any less random than one drawn by selecting six new names from the box. There is no indication that the group was skewed in such a way as to prejudice either side in a criminal trial.

Appellants complain that Dean Smith, who ultimately was the jury forewoman in the case at bar, had served on a jury which had convicted one Duncan Webb in another trial. But there is no assertion that the witnesses and counsel in the Webb case had anything to do with the case at bar, or that the issues in the Webb case had any relationship to this case. Mere service in another case in which a guilty verdict was returned does not disqualify a juror.

In our view there was substantial compliance with the random selection procedures and, further, no prejudice to the defendants has been shown. As to this question there is no error.

## II.

■ Taylor contends that his confession was taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). After having signed a written waiver form, Taylor indicated that he did not want to talk about Vail, but the questioning by Officer Bailey continued. He asserts that any questioning thereafter was a violation of the *Miranda* requirements, relying upon *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975); *United States v. Riggs,* 537 F.2d 1219 (4th Cir. 1976); *Tarnef v. State,* 512 P.2d 923 (Alaska 1973), and *People v. Barrow,* 60 Cal.App.3d 984, 131 Cal.Rptr. 913 (1976). However, we find these cases to be distinguishable in various respects.

We do not view Taylor's remark to Officer Bailey as an attempt to cut off questioning entirely. In view of the ambiguity of Taylor's remark, Officer Bailey properly continued questioning under these circumstances. *See United States v. Davis,* 527 F.2d 1110 (9th Cir. 1975), *cert. denied,* 425

U.S. 953, 96 S.Ct. 1729, 48 L.Ed.2d 196 (1976); *Conway v. State,* 7 Md.App. 400, 256 A.2d 178, 184 (1969); *Lamb v. Commonwealth,* 217 Va. 307, 227 S.E.2d 737, 741 (1976). There is nothing in the record which indicates any psychological coercion by Officer Bailey. Therefore, we hold that Taylor's *Miranda* rights were honored.

Taylor also contends that his confession was involuntary because it was the result of implied promises of leniency. The implication arises, it is argued, from past friendly contacts between Officer Bailey and Taylor, and because Taylor had talked to the police freely on past occasions and no charges had been filed against him as a result of these conversations. These circumstances, without more, are insufficient to create any implied promise. We find this contention to be without merit.

Lastly, it is urged that Taylor did not knowingly and intelligently waive his *Miranda* rights, as it was probable that Taylor knew that no lawyer was available in Kodiak to aid him at the time of his interrogation. However, the immediate availability of an attorney is not a required condition of a valid waiver of *Miranda* rights. *Schade v. State,* 512 P.2d 907, 915 (Alaska 1973). The significance of advising the accused of his right to counsel is that after a demand for counsel is made all questioning must cease until counsel is present. *Miranda v. Arizona, supra,* 384 U.S. at 474, 86 S.Ct. 1602. It is not necessary for the officer to explain the benefits of counsel to the defendant in order for a valid waiver to occur. *Peterson v. State,* 562 P.2d 1350, 1362–63 (Alaska 1977). There was no error in the admission of Taylor's confession.

### III.

■ Vail contends that his confession was involuntary and therefore should not have been admitted. His claim is grounded upon the following: the confession was made during the early morning hours; there were implied promises of leniency; he was subjected to "solitary confinement;" and psychological coercion was applied to get him to talk. The trial court found against Vail as to each of these contentions. Our review of the record convinces us that the trial court's ruling was correct.

Vail was in the habit of staying up late at night. His early morning interrogation was not shown to be an attempt to take advantage of his fatigue, as was the interrogation in *Gladden v. Holland,* 366 F.2d 580 (9th Cir. 1966), on which Vail relies. It also appears that Vail was placed in a separate cell, a few hours before his confession, not to coerce him into confessing but merely to segregate him from Timothy Taylor. There was nothing punitive about placing Vail in a separate cell. His reliance on *Townsend v. Henderson,* 405 F.2d 324 (6th Cir. 1968), is thus misplaced.

As to promises of leniency, the testimony of Officer Monroe and of Vail is in conflict. The trial court apparently resolved these discrepancies against Vail, and we are unable to find, on the basis of the record, that the court erred in this respect.

Lastly, it is claimed that Vail was laboring under a psychological depression which might have rendered his confession involuntary. As to this point we note that the psychiatric testimony at trial was in conflict. This claim was far from established, and we can perceive no error in the admission of the confession in this regard.

In summary, we hold that Vail's confession was properly admitted at trial.

### IV.

■ Both Taylor and Vail contend that they were denied the right to speedy trial under Criminal Rule 45. That rule provides that a defendant must be tried within 120 days from his arrest, arraignment, or charge, but a number of delays are to be excluded in computing the 120 day period. Alaska R.Crim.P. 45(d).

In the case at bar the only question is whether the time consumed by the petition for review to this court should be excluded in its entirety. It is clear that if the time during which this case was considered on petition for review is excluded, and the other conceded exclusions are applied, the trial was held within the prescribed time.

The state petitioned for review on June 25, 1976, after the trial court stated that it would accept a plea of guilty to manslaughter by Vail. All opposing and supplemental memoranda were filed by July 23, 1976. Our opinion was published on October 15, 1976, and our mandate issued on October 25, 1976.

Rule 45(d)(1) provides for excluding from the time computation:

The period of delay resulting from other proceedings concerning the defendant, including but not limited to motions to dismiss or suppress, examinations and hearings on competency, the period during which the defendant is incompetent to stand trial, *interlocutory appeals*, and trial of other charges. No pre-trial motion shall be held under advisement for more than 30 days and any time longer than 30 days shall not be considered as an excluded period. [Emphasis supplied].

It is argued that the thirty day limitation on pre-trial motions under advisement should apply to petition for review after they are submitted to this court. Throughout this argument the term "motion" is used interchangeably with "petition for review," although they are procedurally quite distinct entities, and are mentioned separately in Criminal Rule 45(d)(1).

There are significant differences in the handling of trial court motions and petitions for review. The former are determined only by one judge. When a petition for review is considered by this court it is necessary that it be assigned to a justice who makes a recommendation as to its disposition to the other justices. After the other justices have voted and expressed their views on the petition, and if a written opinion is necessary, a draft opinion must be prepared and circulated among the other justices. Frequently further discussion, written commentary, and alteration of the draft opinion will ensue before it can be published. In some cases dissenting opinions will be prepared. It is simply inconceivable that such a deliberative and decisional process could be completed in all criminal cases within thirty days after submission.

In adopting the rule it was not our intention, and the language of Rule 45(d)(1) does not require, that the thirty day limitation be applied to petitions for review pending before this court. Defendants were not denied their right to speedy trial under this rule.

We find Vail's argument that his constitutional right to speedy trial, apart from Criminal Rule 45, was violated to be without merit. *See Tarnef v. State*, 512 P.2d 923, 933 (Alaska 1973); *Nickerson v. State*, 492 P.2d 118, 120 (Alaska 1971).

## V.

██ Vail argues that the trial court erred in not granting a bifurcated trial on the issues of guilt and insanity, and that he was prejudiced by the testimony of the psychiatrist, Dr. Olivier, which contained certain admissions of Vail as to the commission of the offense.

We note that on the record here there was no substantial conflict between Vail's defense on the merits of the homicide charge and his insanity defense. There being no antagonism between the defenses as to the two issues, there could not be an abuse of discretion by the trial court in denying bifurcation. *Kinsman v. State*, 512 P.2d 901, 903–904 (Alaska 1973). As to the balance of Vail's argument, we note that he did not set forth sufficient grounds at the trial court level as to why he would be prejudiced if bifurcation were not granted. We find no error.

Next, Vail argues that his trial should have been severed from that of Taylor because Vail's defense was antagonistic to that of Taylor. It is true that Taylor testified at trial and attempted to shift the blame for the killing to Vail. However, at the trial court level Vail did not bring this contention clearly to the attention of the court. He cannot now make this claim for the first time on appeal. *Cleveland v. State*, 538 P.2d 1006 (Alaska 1975). *See also Middleton v. State*, 577 P.2d 1050 (Alaska 1978). We find the balance of Vail's

argument on the severance question to be unpersuasive.

## VI.

Vail argues additionally that error was committed in a number of respects: (1) that it was error to grant the prosecution twelve additional peremptory challenges (after granting ten peremptory challenges to each defendant); (2) that it was error to allow the state to peremptorily challenge a seated juror, after the juror had been passed both for cause and for peremptory challenge; (3) that it was error not to excuse a juror who had read a newspaper article about the case prior to trial; (4) that the court erred in examining Vail's psychiatric witness; (5) that Vail was prejudiced by his attorney's lack of effective assistance at trial; (6) that Vail was prejudiced by not being able to wear certain clothes during trial; (7) that the indictment should have been dismissed because it was based upon insufficient evidence; (8) that it was error to admit the statements made by Taylor to the police officers at Kodiak; (9) that Vail's consent to police seizure of the knife used in the killing was invalid; and (10) that certain jury instructions were in conflict and amounted to plain error.

Taylor argues additionally certain claimed errors: (1) that the indictment should have been dismissed because it was based on insufficient evidence; (2) that the admission into evidence of Vail's confession was error; (3) that evidence of admission made by the defendants to certain witnesses should have been excluded.

We find each of these claims of error to be devoid of merit. Moreover, a discussion of our disposition of these claims would provide nothing of value, or at best only something of marginal value, as an exposition of the law. It is our conclusion that further discussion of these claims of error is unwarranted.

## VII.

After the verdict was returned, Vail's attorney moved that Vail be committed to a mental hospital to determine his competency. The superior court properly denied that motion, for nothing which occurred at trial, including the testimony of psychiatric witnesses, suggested that Vail was incompetent. Vail argues that such a commitment was mandatory under the statutory language which says that upon such a motion being made the court "shall have the accused, . . . examined as to his mental condition." We disagree. First, the statute assumes that the person making the motion has "reasonable cause" to believe that the accused is laboring under a mental disease or defect. No reasonable cause was brought forth here. Second, the statute states that the court "may order the accused committed for a reasonable period," and it is not mandatory. See AS 12.45.-100(b).

The trial judge did order that a supplementary psychiatric report be submitted as an aid in sentencing. This was not done, however.

The absence of such a report does not vitiate the sentencing proceeding. While we have stressed the importance of a psychological evaluation in serious cases in which a young offender is sentenced to a lengthy term, *Tommy v. State*, 551 P.2d 179 (Alaska 1976); *Davenport v. State*, 543 P.2d 1204 (Alaska 1975); *Hawthorne v. State*, 501 P.2d 155 (Alaska 1972); *Robinson v. State*, 484 P.2d 686 (Alaska 1971); this is not necessary when the trial court has ample information concerning the defendant. *Adams v. State*, 521 P.2d 516 (Alaska 1974); *Newsom v. State*, 512 P.2d 557 (Alaska 1973). Here the court had copious information about Vail, including the testimony and written reports of psychiatrists at earlier stages of the case. There was no error.

Taylor asserts that he is an excellent candidate for rehabilitation, that the protection of society does not require a life sentence in this case, and that the trial court was mistaken in classifying Taylor as being without prospects of rehabilitation. In support of this line of argument Taylor points to various reports and witnesses presented to the court in connection with the sentencing who expressed views that Taylor did have some rehabilitative potential. It does not appear to us that the court

evaluated this material improperly. The court's conclusion, that Taylor was an "aggressive, hostile person who has little control over his antisocial impulses," is borne out by the record.[5]

Taylor argues that the imposition of a life sentence implies that the court regarded him as the worst type of offender within the category of persons committing first degree murder, and that such a characterization is unwarranted by the record. We note that the trial court did not explicitly label Taylor as the worst type of offender. Such a finding is not a prerequisite to the imposition of a life sentence for the offense of first-degree murder.[6] In reviewing the sentence we must also consider "the nature of the offense, the defendant's character, and the need for protecting the public." *Fox v. State*, 569 P.2d 1335, 1337 (Alaska 1977). Our review of the record leads us to the conclusion that in imposing sentence upon Taylor the trial court was not clearly mistaken. *McClain v. State*, 519 P.2d 811 (Alaska 1974).

AFFIRMED.

---

5. The court was impressed by an assault committed by Taylor and Vail while they were free on bail awaiting trial for the death of Sickles. They brutally assaulted a middle-aged alcoholic, without provocation. Taylor cut him with his knife, hit him, and kicked him in the face, in order to "shake him up."

6. As Justice Erwin observed in his 1975 review of sentence appeals in Alaska, in homicide cases "the nature of the crimes predominated over almost all other considerations." Erwin, "Five Years of Sentence Review in Alaska," 5 UCLA-Alaska L.Rev. 1, 5 (1975).