Eddie Robert GRIFFITH, Appellant,

v.

STATE of Alaska, Appellee.

No. 2962.

Supreme Court of Alaska.

May 5, 1978.

Sue Ellen Tatter and Barbara J. Miracle, Asst. Public Defenders and Brian Shortell, Public Defender, Anchorage, for appellant.

Glen C. Anderson, Asst. Dist. Atty., Joseph D. Balfe, Dist. Atty., Anchorage and Avrum M. Gross, Atty. Gen., Juneau, for appellee.

## OPINION

Before BOOCHEVER, C. J., and RABINOWITZ, CONNOR, BURKE and MATTHEWS, JJ.

CONNOR, Justice.

Eddie Robert Griffith was convicted by a jury on March 11, 1976, of attempted robbery in violation of AS 11.15.240. He was sentenced to five years imprisonment.

The primary issue on appeal is whether the trial court erred in denying Griffith's motion to suppress evidence of a knit cap seized pursuant to a warrant. The warrant was issued following a warrantless search of his personal effects by jail custodians, three months after his arrest. Griffith also appeals his sentence.

On December 15, 1976, two men grabbed Albert Scepurek in the men's room of the Anchorage Scandinavian Club, apparently intending to rob him. Scepurek successfully fought off his attackers although he was 62 years old and one of his assailants (later identified as Griffith) threatened him with a knife. Both assailants then resumed socializing at the bar where Scepurek had a second opportunity to observe them.

Scepurek reported the incident to the vice squad two nights later. He was able to give a detailed description of one of his assailants, whom the other had called "Eddie" during the scuffle, including the fact that he was wearing an unusual brown turban-like cap. Vice Squad Officer Eugene Parmeter thought the description fit Griffith, with whom he was familiar from his "beat." He and Officer Donald Trudeau drove Scepurek downtown to see if Scepurek would be able to identify his attackers.

Scepurek spotted Griffith leaving a downtown theater, and identified Griffith as his assailant. Scepurek was positive in his identification and noted that Griffith was wearing almost the same clothing he had been wearing the night of the robbery, including the cap.

### The Search Issue

Griffith was wearing the brown knit cap when he was arrested, but it was not held as evidence. The cap was placed, along with Griffith's other personal effects, in a canvas bag which was in turn stored in a metal property locker maintained by jail custodians in accordance with standard jail procedure. Griffith signed a receipt which listed the property and stated that it was held in trust for him. Prisoners do not generally have access to their property lockers, but their consent is required if non-jail personnel seek to inspect the property. This procedure, which is intended primarily to safeguard the inmate's property while he is incarcerated, differs from the procedure followed for booking property that is to be used as evidence.

During an identification suppression hearing, Officer Trudeau realized that the cap might be important as evidence at trial. He called a jail shift supervisor, and requested that he look through Griffith's belongings to see if the cap were still there. While Trudeau waited on the phone, the

supervisor had a booking officer search Griffith's locker. The cap was located, and Trudeau requested that a hold be placed on it.

The trial jury had already been empanelled when Trudeau informed the district attorney that the cap was available. Since jail officials refused to turn the cap over without a court order, the district attorney requested an order from the court. Defense counsel moved that the state's request be treated as an application for a search warrant, and that evidence to establish probable cause be taken.

The court incorporated Scepurek's suppression hearing testimony wherein he testified that his assailant, whom he identified as Griffith, was wearing a brown-knit turban cap. Officer Trudeau testified that Griffith was wearing the hat when he was arrested, and that Griffith had remained in custody since his arrest. The trial judge issued a search warrant, finding that there was sufficient probable cause to seize the cap. He further held that since jail personnel have access to inmates' property lockers, Griffith could not complain that the search conducted at Trudeau's bidding was illegal. The cap was introduced into evidence at trial.

■ Griffith argues that *Brett v. United States,* 412 F.2d 401 (5th Cir. 1969), should govern here.[1] In *Brett* the court held that an exploratory search of a prisoner's clothing which occurred three days after arrest was not incident to an arrest and was, therefore, unlawful. The rationale of *Brett* is that police custody of a prisoner's clothing does not alone create an exception to the requirement of a search warrant. However, the *Brett* case has been limited by other opinions of the Fifth Circuit which uphold warrantless searches of stored property which yield evidence that had already been seen at the original inventory. *United States v. Grill,* 484 F.2d 990 (5th Cir. 1973), *cert. denied,* 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974). *See also Westover v. United States,* 394 F.2d 164 (9th Cir. 1968); *Evalt v. United States,* 382 F.2d 424 (9th Cir. 1967).

As the court observed in *Grill*:
"The underpinning of these cases is that the items in question have been exposed to police view under unobjectionable circumstances, so that no reasonable expectation of privacy is breached by an officer's taking a second look at matter with respect to which expectation of privacy already has been at least partially dissipated."[2]
484 F.2d at 991.

We find this approach to be sound. No invasion of privacy occurred in the circumstances of this case. Officer Trudeau saw the cap at the time of Griffith's arrest. The later telephone call to the jail supervisor merely verified the continued availability of that which had been available and in plain view to Trudeau at the time of the arrest. In the circumstances we conclude that the seizure of the cap was reasonable, and its introduction into evidence was not error.[3]

■ There is also present in this case an alternative ground for sustaining the seizure of the cap. The trial court issued a warrant for the seizure of Griffith's hat. The warrant was based in part upon the testimony of Scepurek that Griffith was wearing the hat both when the offense was committed and when Griffith was arrested. Trudeau testified that he arrested Griffith and that he was wearing the hat at that time. This information, combined with the fact that Griffith had been in continuous

---

1. We cited *Brett* and discussed it in *Lemon v. State,* 514 P.2d 1151 (Alaska 1973).

2. This has been referred to as the "second glance" doctrine. The theory is that when a thing has once been in plain view the privacy interest in that thing terminates. *United States v. Maslanka,* 501 F.2d 208, 214 n. 12 (5th Cir. 1974).

3. We do not pass upon the contention of the state that *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), validates all searches of a prisoner's personal property once that property has been taken from the prisoner for storage during his detention.

custody since the arrest, supplied the court with probable cause to issue a warrant, even disregarding Trudeau's testimony that his telephone call confirmed the continued presence of the hat at the jail. Thus the issuance of the warrant was proper, the hat was lawfully seized, and no error was committed by the introduction of the hat into evidence.

### The Sentence Appeal

Griffith alleges that the sentencing court erred in imposing a five year sentence because: (1) the court failed to obtain a psychiatric evaluation prior to sentencing; (2) the sentence was excessive; and (3) the court inadequately explained its rationale for the sentence imposed.

Griffith was 19 years old at the time of the attempted robbery. It was his first conviction. The judge expressed his reasons for the sentence as follows:

"Mr. Griffith I look at this case and I look at you, and attempted robbery is a very serious crime. Robbery is one of the most serious crimes there is. The maximum which I could give you is 7½ years, one-half of the maximum penalty for robbery. The fact that a knife was used in the course of the robbery makes it more serious. Even though you're a first offender I view robbery as being such a serious crime that I'm going to give you 5 years in prison, and all of that 5 years to serve. I'm going to order a psychological and psychiatric evaluation and bring this on for a review hearing of your sentence after the receipt of that evaluation and we'll set the date right now as June 4th at 9:00 a. m. I want you to cooperate with the psychiatrist and psychologist. However, it's unlikely that your sentence will be changed by that, but the division of corrections might classify you differently as a result of the report from the psychiatrist.

. . . . .

I see you as a serious offender, Mr. Griffith. I see you as somebody who cannot control your urges and emotions. I see you as somebody who constitutes a danger to other people and unless you change your view of how this world works, you are a danger to other people."

Apparently the trial judge thought, when he sentenced Griffith, that the presentence report contained a psychiatric evaluation. When he realized it did not, he ordered a psychiatric report. The scheduled June 4 sentence review was advanced to May 13 at the request of a probation officer working at the Eagle River Correctional Center. While Griffith was at Eagle River, he had become verbally disruptive and was sent to the Alaska Psychiatric Institute. Griffith spent two days at A.P.I. Dr. J. E. Olivier submitted a psychiatric report to the court. The court considered this report, along with testimony of the probation officer, at the sentence review hearing.

We have stated several times that in sentencing young offenders the sentencing judge should have the benefit of a current psychiatric evaluation before finding rehabilitation inappropriate. *Tommy v. State,* 551 P.2d 179, 180 (Alaska 1976); *Davenport v. State,* 543 P.2d 1204, 1211 (Alaska 1975). While it is preferable to have such an evaluation prior to sentencing, it is acceptable if the trial court considers the report at a subsequent hearing upon defendant's motion to reduce his sentence. *Pike v. State,* 570 P.2d 1066 (Alaska 1977). The psychiatric report submitted in this case did not reveal any psychiatric or emotional problems beyond those discussed in Griffith's presentence report, which the trial judge did have before him at the initial sentencing. *See Adams v. State,* 521 P.2d 516, 518–19 (Alaska 1974); *Newsom v. State,* 512 P.2d 557 (Alaska 1973).[4] More-

---

4. An in-depth presentence report and the judge's awareness of the defendant's rehabilitative potential were held to be sufficient to affirm the trial court's sentence despite the lack of a psychiatric report in *Newsom v. State, supra.*

"An adequate psychiatric evaluation at the time of sentencing is extremely helpful to the sentencing judge. That is not to say, however, that a psychiatric evaluation is indispensable or necessary. More important than any single form of information about the con-

over, the report does not indicate psychological problems of such a nature as to justify remanding for resentencing in light of the evaluation. *See Marks v. State,* 557 P.2d 1136, 1138 (Alaska 1976).

Griffith next contends that the trial court was clearly mistaken in imposing a five year sentence. Sentencing goals include rehabilitation and the protection of society. *State v. Chaney,* 477 P.2d 441, 443 (Alaska 1970). The sentencing court can also reflect the community's condemnation of certain crimes in imposing sentence. *Newsom v. State,* 533 P.2d 904, 911 (Alaska 1975). The sentencing judge must determine the priority and relationship of these sentencing objectives.

We have noted that robbery is a very serious crime, and have affirmed heavy sentences in such cases, particularly where a weapon was used. *Holloway v. State,* 535 P.2d 467, 469 (Alaska 1975); *Hixon v. State,* 508 P.2d 526, 527 (Alaska 1973). A five year sentence for robbery was sustained for an eighteen-year old's first adult conviction in *Marks v. State,* 557 P.2d 1136, 1138 (Alaska 1976). Five years was also affirmed for attempted robbery in *Washington v. State,* 552 P.2d 660, 661 (Alaska 1976), although the defendant there had two prior convictions.

Griffith's conviction is for attempted robbery, but it is worth noting that the only reason that the robbery was not completed was that the victim struggled. Griffith did not withdraw voluntarily. Also, the victim was 62 years old and was "roughed up," as well as threatened with a knife. In light of the sentencing objectives set forth in *State v. Chaney, supra,* and of the dangerous nature of Griffith's act, we do not find that the trial judge was clearly mistaken in imposing the sentence he did.

Griffith's last contention, that the trial judge failed to adequately explain his reasons for imposing the five year sentence, is without support in the record. The judge

articulated his thought processes and discussed his sentence rationale with Griffith. Upon our review of the record, we find that the judge's discussion was sufficient to provide both an adequate record for appellate review and to fully inform Griffith of the reasons for the five year term. *Andrews v. State,* 552 P.2d 150, 153 (Alaska 1976); *Perrin v. State,* 543 P.2d 413, 418 (Alaska 1975).

AFFIRMED.

RABINOWITZ, Justice, concurring.

I would uphold the superior court's denial of appellant Eddie Griffith's motion to suppress the knit cap without relying upon a "second glance" rationale. For in my view, study of the record convincingly shows that on the basis of the information available to Officer Trudeau, before he requested the jail personnel to inspect Griffith's property locker and excluding all testimony concerning the inspection, the prosecution proved probable cause for the issuance of the search warrant in question.

I note my agreement with the court's treatment of all other issues in this appeal.

victed defendant is the general sufficiency and accuracy of that information in terms of the objectives of sentencing review." (footnote omitted) 512 P.2d at 562.