COMMONWEALTH vs. MICHAEL S. SULLO.

No. 87-1345.

Middlesex.    November 9, 1988. — January 18, 1989.

Present: BROWN, KAPLAN, & KASS, JJ.

*Constitutional Law,* Search and seizure. *Search and Seizure,* Arrest, Container.

Article 14 of the Massachusetts Declaration of Rights required exclusion, at a criminal trial, of the defendant's personal papers seized during booking at a police station pursuant to an unwritten police "inventory procedure" that gave no guidance on the treatment to be given such items. [768-769]

The warrantless scrutiny of an arrested person's personal papers by a police officer during booking at a police station was an unlawful search where there was no fair custodial purpose for the officer's perusal of the papers. [769]

Discussion of the question of the permissible extent of police examination of an arrested person's personal papers without a warrant as part of an inventory (custodial) search. [769-771]

A police "inventory procedure" that was a pretext concealing an investigatory motive in the examination of an arrested person's personal papers was unlawful under the Federal and State Constitutions. [772]

Where the Commonwealth had not carried its burden of establishing that the examination of an arrested person's personal papers was a lawful inventory search, the denial of the defendant's motion to suppress information derived from the search was error. [772]

COMPLAINT received and sworn to in the Waltham Division of the District Court Department on February 3, 1986.

On appeal to the jury session of the Framingham Division, a pretrial motion to suppress evidence was heard by *Joseph D. Clancy,* J., and the case was tried before *Austin T. Philbin,* J.

*Rosemary D. Mellor,* Assistant District Attorney, for the Commonwealth.

*William R. Marino,* for the defendant, submitted a brief.

KAPLAN, J. Sergeant James Conley of the Watertown police, while on routine patrol at 2:30 A.M., February 2, 1986, noticed three cars parked in front of the Nanking Village restaurant on Waverly Avenue, an establishment licensed for alcoholic beverages.[1] Lawful closing time was 1:30 A.M., but looking through a window Conley saw a few persons still in the place. One of those who left on Conley's admonition was the defendant Sullo. Inquiry by radio revealed that Sullo had two (confirmed) warrants for speeding outstanding against him. Accordingly, Conley placed Sullo under arrest and brought him to the Watertown police station. During booking, Conley conducted an "inventory" search of Sullo's person; afterward he searched Sullo's car which had remained parked near the restaurant.

As a result of these searches, Sullo was charged with violation of the gaming law, G. L. c. 271, § 17. He moved at a jury-of-six session in District Court to suppress the items seized. His motion succeeded with respect to the material seized from the car; that search was held "pretextual," and the Commonwealth did not attempt an appeal. Sullo's motion failed regarding the personal inventory search. After trial and conviction of the gaming offense, Sullo appeals, bringing up for review the refusal to suppress information derived from certain business cards seized during the inventory search. We hold this was error, which infects the judgment of conviction.

To return to the details of the inventory search at the police station, from the defendant's right front pocket came bills in the amount of $2,200 and from his left front pocket bills totalling $5,250. Also brought out was a vinyl or plastic business card holder wrapped with an elastic band. Conley removed the elastic, opened the case, took out thirty business cards and a piece of paper folded to the size of a business card, and perused each of the cards and the paper. On fifteen of the cards and on the paper, Conley testified, "there are initials, there are pluses, minuses, and there are figures." Conley said

---

[1] The judge's findings of fact upon the motion to suppress are here supplemented by uncontested details. See *Commonwealth* v. *Oreto,* 20 Mass. App. Ct. 581, 582 (1985).

he recognized the writings as "cuff sheets" in a gambling operation.[2] The cards and the paper were seized and sequestered.

The scrutiny of the writings is defended by the Commonwealth as a legitimate part of an inventory search. A search of that category is carefully circumscribed by law because, as an exception to the ordinary constitutional requirements, the search may be conducted without warrant or probable cause. First, the search must follow a standard or routine procedure adopted and recognized by the police force. Second, it may not extend beyond the custodial necessities which are its sole justification. Third, it may not become a cover or pretext for an investigative search. We believe the present search was illegal by reference to each and all of these canons.

1. Conley testified that he "inventoried according to procedure," meaning thereby that he took or received the items from Sullo's person, made note of them, and placed them in envelopes or the like for safekeeping. The procedure, such as it was, was unwritten, and thus almost inevitably vague.[3] But quite apart from that, the procedure was defective because it gave no guidance on the treatment of papers taken from an arrestee, a class of property with particular claims to privacy. In *Commonwealth* v. *Bishop*, 402 Mass. 449, 451 (1988), the (written) police standard for search of motor vehicles was held insufficient because it did not deal with the extent of a lawful search of a "container" found in a vehicle. The (unwritten)

---

[2] Conley had very little experience with gambling offenses and did not qualify as an expert on gambling techniques or paraphernalia. A Commonwealth expert testified at trial that a "cuff list" or "bottom sheet" is a "list of account designations for a gambling operation which list the amounts that are owed to the bettors by the operation and the figures would be reflected in a plus or minus figure."

[3] In *Commonwealth* v. *Ford*, 394 Mass. 421, 426 (1985), search of an automobile was held invalid because the Watertown police had no standard procedure for such searches. The Watertown police later adopted a written procedure for those searches but not for preincarceration inventory searches like the one at bar. By the later decision in *Commonwealth* v. *Bishop*, 402 Mass. 449, 451 (1988), a procedure, to count thereafter as standard, must be in writing.

procedure in the present case suffered from just as serious a lacuna.[4]

2. Conley's sifting and perusal of the backs of the business cards, yielding information, was not a proper part of an inventory search because it did not respond to the fair custodial purposes as described below (including, prominently, the flushing out of weapons and contraband).

The question of the permissible extent of police examination of an arrestee's papers arose during the early analysis by the American Law Institute, on principle, of inventory (custodial) searches. In the Model Code of Pre-Arraignment Procedure (approved by the Institute in 1975), we find the following (at 530): "The legitimate aims of a custodial search have been described as including the safeguarding of the prisoner's property, protection of the police against charges of theft, and keeping out of the jail any things dangerous to prison administration. Generally speaking, none of these purposes will justify reading the accused's papers, except for the limited purposes specified in Subsection (2) [of § SS 230.6]." The subsection (at 146) states in part: "Documents or other records may be read or otherwise examined only to the extent necessary for such purposes [custodial], including identity checking and ensuring the arrestee's physical well-being."

In *South Dakota* v. *Opperman*, 428 U.S. 364 (1976) (5-4 decision), the Court validated the warrantless search pursuant to standard procedure of the unlocked glove compartment of an impounded motor vehicle. Justice Powell, joining in the Court's opinion and expressing additional views, discussed the limits on these searches fixed by their intrinsic purposes. Coming to the scrutiny of writings encountered in these searches, Justice Powell said (at 380 n.7): "As part of their inventory search the police may discover materials such as letters or

---

[4] The card holder at bar, enclosed by an elastic band, is a kind of "container." The question of the legality of breaching a container in a search of an impounded motor vehicle was reserved in the *Bishop* case (402 Mass. at 451 & n.1). The question is perhaps more acute in the case of a container taken in the course of an inventory search of an arrested person. In the present opinion we skirt the whole issue of the legality of opening containers, as the appeal may be decided on other grounds.

checkbooks that 'touch upon intimate areas of an individual's personal affairs,' and 'reveal much about a person's activities, associations, and beliefs.' *California Bankers Assn.* v. *Shultz*, 416 U.S. 21, 78-79 (1974) (Powell, J., concurring). See also *Fisher* v. *United States*, 425 U.S. 391, 401 n.7 (1976). In this case the police found, *inter alia*, 'miscellaneous papers,' a checkbook, an installment loan book, and a social security status card. Record 77. There is, however, no evidence in the record that in carrying out their established inventory duties the Vermillion police do other than search for and remove for storage such property without examining its contents." It is believed that the whole Court would have agreed with this negative indication regarding the examination of papers. (See note 5, *infra*.)

We need to put to one side propositions that are not involved in order to reach the particular point that is in issue. For the present analysis we need not dispute that the police, before committing a person to a cell, may take up and inventory and retain in custody all the items he has on his person, including even those drawn from a container; we need not quarrel with an inventory of the contents of a wallet, see *Commonwealth* v. *Wilson*, 389 Mass. 115, 117 (1983), or of a shoulder bag, see *Illinois* v. *Lafayette*, 462 U.S. 640 (1983). Similarly we can assume that the police may handle a collection of papers or the like so as to draw out money or a thin packet of drugs that may have been interleaved. We can even assume arguendo that the police are not required to blind themselves to information appearing on a paper or card that declares its nature to anyone at sight, such as a driver's license or credit card. What the police may not do is hunt for information by sifting and reading materials taken from an arrestee which do not so declare themselves: here is the vice aimed at by the A.L.I. and the passage from *Opperman*. As such scrutiny serves none of the practical, lawful objectives of an inventory search preceding incarceration, it is proscribed by the constitutional provisions unless done under warrant on probable cause.[5]

---

[5] Professor LaFave has the following comment: "It is to be doubted, however, whether inventory justifies scrutiny of particular items beyond that

Opinions approaching the particular point are not numerous. In *State* v. *Rodewald*, 376 N.W.2d 416, 421-422 (Minn. 1985), Amdahl, C.J., showed awareness that, while riffling through cards to get at any concealed drugs might be legal procedure, information obtained by a sedulous reading of the cards should be excluded as evidence, consistently with Justice Powell's statement in *Opperman*. Opinions in *People* v. *Hamilton*, 74 Ill. 2d 457, 467-469 (1979), *Boone* v. *State*, 39 Md. App. 20, 30-32 (1978), *State* v. *Mangold*, 82 N.J. 575, 591-592 (1980) (Pashman, J., concurring), and *People* v. *Roman*, 53 N.Y.2d 39, 41 (1981), all referring to the *Opperman* passage, appear sympathetic to the view we express here; and decisions of the courts of Alaska and Hawaii take positions referable to their State constitutions that would lead to the support of that view. See *Reeves* v. *State*, 599 P.2d 727 (Alaska 1979); *Lyle* v. *State*, 600 P.2d 1357 (Alaska 1979); *State* v. *Kaluna*, 55 Haw. 361 (1974). A few California cases may now be looking the other way: perhaps they (incorrectly) recognize no limits on the use of information culled from papers; perhaps the papers involved were thought to have declared themselves to any person who handled them in the course of inventory. See *People* v. *Hovey*, 44 Cal. 3d 543, 570-571 (1988); *People* v. *Hamilton*, 46 Cal. 3d 123, 137-138 (1988); *People* v. *Dominquez*, 201 Cal. App. 3d 345 (1988).

---

necessary to identify them in an inventory list, and thus a close or complete reading of documents or letters beyond that necessary to determine their general character would be improper. In *South Dakota* v. *Opperman*, 428 U.S. 364 . . . (1976), upholding inventory of impounded vehicles, Justice Powell, who provided the deciding vote, indicated he would not approve of the close examination of 'materials such as letters or checkbooks that "touch upon intimate areas of an individual's personal affairs." ' It is possible nonetheless that in merely sorting out these papers during inventory something incriminating will catch the eye of the inventory officer. See, e.g., *People* v. *Perel,* 34 N.Y.2d 462 . . . (1974), (officer saw on a slip of paper the name of a woman who had obtained an abortion); *State* v. *Mordeszewski,* 68 Wis.2d 649 . . . (1975) (defendant objects officer should not have read papers in his wallet; court responds headline of newspaper clipping about recent rape merely 'caught his eye' as he scanned the half inch thick packet of papers in defendant's wallet)." 2 LaFave, Searches & Seizures § 5.3(a), at 482 n.30 (2d ed. 1987).

3. In making an inventory — taking from the person, noting what is received, and placing it in safekeeping — the police are to act more or less mechanically, according to a set routine, for to allow then a range of discretion in going about a warrantless search would be to invite conduct which by design or otherwise would subvert constitutional requirements. The police officer herein was not merely following a routine; he was using discretion in exploring a lead. The lead was provided by the stacks of money found on Sullo's person; speculation about the origins of the money brought about the close inspection of the markings on the backs of the cards. But here the constitutions, State and Federal, came into play to require a showing of probable cause and exigent circumstances if a warrant was to be forgone. The distinction is between an inventory search and an investigative search, a search for evidence. The judge below, although stating that standard procedure was followed, quite clearly gave up the true purport of the officer's conduct when he emphasized that "[t]he appearance of a defendant at a booking desk at approximately 3:00 A.M. . . . and possessing approximately $7,500 in cash is not a usual occurrence" and then justified his ruling that the treatment of the cards was legal by pointing to "the totality of the circumstances." These are the telltale signs of an investigative search: here "the procedure was a pretext concealing an investigatory police motive." *Commonwealth* v. *Matchett*, 386 Mass. 492, 510 (1982).[6]

The Commonwealth has not carried its burden of establishing that this was a lawful inventory search. Upon the facts, we reach our own conclusion concerning the constitutional question.

For error in the denial of the motion to suppress, the judgment is reversed, and the verdict is set aside.

*So ordered.*

---

[6] General Laws c. 127, § 3 (record keeping of money and other property taken from prisoners) provides no basis for investigatory searches, nor does it palliate the other violations described in this opinion.