Michael D'ANTORIO, Petitioner,

v.

STATE of Alaska, Respondent.

No. S–6541.

Supreme Court of Alaska.

Nov. 22, 1996.

Christine S. Schleuss, Law Office of Christine Schleuss, Anchorage, for Petitioner.

Cynthia L. Herren, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Respondent.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS, EASTAUGH and FABE, JJ.

*OPINION*

FABE, Justice.

## I. INTRODUCTION

A jury convicted Michael D'Antorio of engaging in a scheme to defraud in violation of AS 11.46.600(a)(1).[1] The superior court sentenced him to ten years of imprisonment with one year suspended and placed him on probation for five years.

Prior to trial, D'Antorio moved to suppress personal papers and credit cards seized during a search conducted in Ohio by an Ohio police detective and later examined by a sergeant of the Alaska State Troopers.[2] The superior court denied the motion and permitted the State to use the evidence at D'Antorio's trial. The issue before us is whether the court of appeals erred in affirming the superior court's decision to admit these papers and credit cards into evidence.

We hold that the search of D'Antorio's personal papers conducted by the Alaska State Troopers cannot be sustained under the "second glance" doctrine. However, we conclude that the seizure of the credit cards occurred pursuant to a proper inventory search and that their examination by the Alaska State Troopers was valid under the "second glance" doctrine. We therefore reverse in part and affirm in part.

## II. FACTS AND PROCEEDINGS

On April 30, 1987, a police officer stopped Michael D'Antorio near Huber Heights, Ohio for driving with a broken headlight. The officer conducted a routine computer check which revealed an outstanding Alaska arrest warrant for D'Antorio for a "parole violation, original charge scheme to defraud." The officer placed D'Antorio under arrest and conducted a brief search of D'Antorio and the car. The car was then impounded and moved to an impound yard.

Huber Heights Detective Susan Finch went to the impound yard several hours later to "inventory" the contents of the car. Finch

---

1. AS 11.46.600(a) provides:
 A person commits the crime of scheme to defraud if the person engages in conduct constituting a scheme
 (1) to defraud five or more persons or to obtain property or services from five or more persons by false or fraudulent pretense, repre-

 sentation, or promise and obtains property or services in accordance with the scheme. . . .

2. D'Antorio also moved to suppress evidence obtained from credit card companies and private mail services. Those portions of the motion to suppress are not before this court.

found an automobile filled with bags of new merchandise, including a camcorder, a convection oven, twenty boxes of shoes, several cases of beer, and numerous closed containers, including suitcases and a briefcase. Detective Finch opened and searched each closed container in the vehicle and found various credit cards and hundreds of pages of documents. These papers included credit bureau reports, business cards, letters, airline tickets, IRS forms and correspondence, college applications, handwritten notes, newspaper wedding announcements and obituaries, sales receipts, and completed credit applications.

Detective Finch conducted an inventory search of the car. She testified that her purpose in inspecting the documents was to identify D'Antorio's property for safekeeping. She listed each of the credit cards separately. However, she filled out no inventory forms for the other papers, nor did her handwritten list of items describe any of the written documents found inside the closed containers in the automobile. Instead, she placed them in plastic bags and labeled them as "miscellaneous papers."

Several days after the inventory was completed, Alaska State Trooper Sergeant Edward Stauber traveled to Ohio in order "to see what they had seized, what was in evidence, and ... to transport Mr. D'Antorio back to Alaska." Sergeant Stauber was aware of D'Antorio's prior conviction for a scheme to defraud and of probation restrictions placed on D'Antorio which prohibited him from possessing credit cards.[3] Stauber took possession of the items and papers from an Ohio evidence custodian. The papers were contained within closed plastic bags, identified by general tags such as "miscellaneous papers from glovebox." Upon returning to Alaska, Sergeant Stauber, without seeking a search warrant for the papers, read each document, copied it, and described it on a detailed list.

D'Antorio filed a motion to suppress these papers and credit cards, asserting that the inventory conducted by Detective Finch in Ohio and the warrantless examination by Sergeant Stauber in Alaska violated the United States and Alaska constitutions. The superior court denied the motion to suppress, and D'Antorio was convicted of a scheme to defraud five or more people.

D'Antorio appealed. The court of appeals held that federal and Ohio law applied to the inventory search conducted by Detective Finch and affirmed the superior court's conclusion that Finch's inventory was valid. *D'Antorio v. State*, 837 P.2d 727, 731 (Alaska App.1992) (*D'Antorio I*). The court of appeals remanded the case to the superior court and stated that

> the pertinent issue is whether the intensity of Stauber's warrantless search of the seized articles materially exceeded the scope of the inventory that Finch had previously conducted—in other words, whether Sergeant Stauber's actions violated a reasonable expectation of privacy that had not already been "dissipated" by Finch's earlier inspection.
>
> . . . .
>
> From the testimony below, it appears that Stauber's search of D'Antorio's property may have been more intensive than Finch's prior inventory search. However, this is a factual issue, which requires findings by the trial court in the first instance. We must therefore remand this case for additional findings.

*Id.* The court of appeals further ordered the superior court, if it found upon remand that any of the inventory search evidence should have been suppressed, to decide whether introduction of that evidence was harmless error. *Id.* at 733–34.

On remand the superior court determined that Sergeant Stauber's examination did not materially exceed the scope of Detective Finch's inventory and that Stauber merely took a "second glance" at the seized items.

---

3. Stauber observed D'Antorio at the Anchorage International airport on December 9, 1986, and was informed by an employee of the Alaska Airlines Board Room that D'Antorio had used a credit card to pay for membership. Stauber began to investigate D'Antorio's use of the credit card, and based on the information Stauber discovered, an arrest warrant was issued for D'Antorio for a probation violation.

In reaching this conclusion the superior court stated:

> As a factual matter, it is undisputed that Sergeant Stauber knew what to look for and closely examined and catalogued every piece of paper provided him by the Huber Heights police. Detective Finch, on the other hand, knew only generally that defendant was wanted in connection with credit card fraud. She was aware of the probable evidentiary significance of the credit cards found in the vehicle; she separately listed each one of them. Sergeant Stauber's search of the credit cards was not more extensive. Admission of evidence regarding the cards was not error. Because Detective Finch was not apprised of defendant's modus operandi, however, she was not necessarily aware of the evidentiary significance of each of the other papers she perused. But she testified that she opened every container found in the car and looked at each piece of paper. She said that she "glanced" through each one "enough to note that it was an application or obituary or whatever kind of article it was." She said she could report the general gist of each piece of paper, but not repeat its contents "verbatim."

The superior court stated that "Stauber did not inspect articles in closed containers that had not previously been opened. Moreover, every paper he inspected was plainly exposed to and observed by Finch." The court concluded that "it cannot reasonably be said that one whose personal papers have been examined item by item by police officers after arrest retains a significant expectation of privacy in these papers." The superior court also found that admission of the questioned evidence may have "appreciably affected" the jury's verdict, and thus any error was not harmless.

D'Antorio appealed, asserting that the superior court erred in finding Sergeant Stauber's "second glance" valid and that Detective Finch's inventory search exceeded the scope of a proper inventory search.

The court of appeals concluded that Sergeant Stauber's "second glance" was valid because D'Antorio's expectation of privacy was at least partially dissipated when the papers were viewed by Detective Finch. *D'Antorio v. State*, Memorandum Opinion and Judgment No. 2961 at 8–10 (Alaska App., July 27, 1994) (*D'Antorio II* ). The court of appeals also reaffirmed its original holding that Detective Finch's inventory was conducted within the bounds of the federal and Ohio constitutions. *Id.* at 11–14.

We granted D'Antorio's petition for discretionary review of the court of appeals' decision.

## III. *DISCUSSION*

In our order granting D'Antorio's petition for hearing, we directed the parties to brief the following two issues in addition to those issues the parties thought relevant.

1. Would it have been permissible for Officer Finch to have read in detail the papers in question as part of the inventory search she conducted?

2. If the answer to the above is negative, can Officer Stauber's search be sustained on a "second glance" rationale?

■ These inquiries direct our analysis of this case. To answer the first question requires us to evaluate the scope of a proper inventory search under federal and Ohio law.[4] However, since Officer Stauber conducted his search as an Alaska State Trooper investigating charges arising in Alaska, we evaluate the applicability of the "second glance" doctrine to his search under Alaska law.

A. *The Permissible Scope of an Inventory Search under Federal and Ohio Law.*

■ "Inventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 373, 107 S.Ct. 738, 741–42, 93 L.Ed.2d 739 (1987) (citing *Illinois*

---

4. Where there is no "ongoing or concerted effort" between Alaska and the foreign jurisdiction, the law of the jurisdiction where the search occurred is controlling. *Pooley v. State*, 705 P.2d 1293, 1302–03 (Alaska App.1985). We look to the law of Ohio as well as federal law to determine the constitutionality of Detective Finch's initial inventory search.

*v. Lafayette,* 462 U.S. 640, 642, 103 S.Ct. 2605, 2607–08, 77 L.Ed.2d 65 (1983) and *South Dakota v. Opperman,* 428 U.S. 364, 366–377, 96 S.Ct. 3092, 3095–3101, 49 L.Ed.2d 1000 (1976)). Inventory procedures were developed in response to three distinct needs: "the protection of the owner's property while it remains in police custody, the protection of the police against claims or disputes over lost or stolen property, and the protection of the police from potential danger." *Opperman,* 428 U.S. at 370, 96 S.Ct. at 3097 (citations omitted).

▇▇▇ The Ohio Supreme Court has similarly held that "[s]o long as the scope of the search is reasonable, taking into consideration the three interests to be protected by the inventory, ... [it will] be held to be a constitutionally permissible intrusion." *State v. Robinson,* 58 Ohio St.2d 478, 391 N.E.2d 317, 319, *cert. denied,* 444 U.S. 942, 100 S.Ct. 297, 62 L.Ed.2d 309 (1979) (quoting *United States v. Edwards,* 577 F.2d 883, 893 (5th Cir.) (en banc), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978)). The Ohio Supreme Court has noted that the inventory search exception does not provide a "general license for the police to examine all the con-

tents" of an automobile during an inventory search. *Robinson,* 391 N.E.2d at 318 (quoting *Opperman,* 428 U.S. at 380, 96 S.Ct. at 3102–03 (Powell, J., concurring)). Rather, a valid inventory search must be limited so as to fulfill only the "administrative caretaking functions" that are its justification. *State v. Hathman,* 65 Ohio St.3d 403, 604 N.E.2d 743, 745 (1992).[5]

Having reviewed the rationale for allowing warrantless inventory searches under federal and Ohio law, we now turn to the dispute before us. We address the issue of the examination of the papers and the examination of the credit cards separately.

1. *A detailed examination of the papers by Detective Finch would have exceeded the permissible scope of an inventory search under federal and Ohio law.*

▇▇▇ In his concurring opinion in *Opperman,* Justice Powell, who cast the deciding vote, considered the constitutional limits of police inventory searches.[6] He stated that police officers conducting an inventory do not have free reign and should not be permitted to examine in great detail items that might

---

5. D'Antorio does not argue in this appeal that Ohio or federal law prohibited Detective Finch from opening the closed containers she found in his car during her inventory search. We therefore decline to consider that issue. We note, however, that under both federal and Ohio law, police may not open closed containers during an inventory search unless they do so under a standardized policy specifically dealing with such containers. *Florida v. Wells,* 495 U.S. 1, 4–5, 110 S.Ct. 1632, 1635–36, 109 L.Ed.2d 1 (1990) (holding that the search of defendant's suitcase, absent a policy with respect to the opening of closed containers, "was not sufficiently regulated to satisfy the Fourth Amendment"); *State v. Hathman,* 65 Ohio St.3d 403, 604 N.E.2d 743, 746 (1992) (holding that a closed container "may only be opened as part of the inventory process if there is in existence a standardized policy or practice specifically governing the opening of such containers"). It does not appear from the record that the Huber Heights Police Department had such a standardized policy in 1987.

We also note that under article I, section 14 of the Alaska Constitution "a warrantless inventory search of closed, locked or sealed luggage, containers or packages contained within a vehicle is unreasonable and thus an unconstitutional search." *State v. Daniel,* 589 P.2d 408, 417–18 (Alaska 1979).

6. Prior to *Opperman* the American Law Institute's Model Code of Pre–Arraignment Procedure § SS 230.6 titled Custodial Search and Seizure provided:

(2) *General Authority.* Things not subject to seizure under Section SS 210.3, which are found in the course of a search conducted pursuant to Section SS 230.3, may be taken from the arrested individual's possession if reasonably necessary for custodial purposes. Documents or other records may be read or otherwise examined only to the extent necessary for such purposes, including identity checking and ensuring the arrestee's physical well-being.

*Model Code of Pre–Arraignment Procedure* § SS 230.6 (A.L.I.1975).

The commentary on this section provides:

The legitimate aims of a custodial search have been described as including the safeguarding of the prisoner's property, protection of the police against charges of theft, and keeping out of the jail any things dangerous to prison administration. Generally speaking, none of these purposes will justify reading the accused's papers, except for the limited purposes specified in Subsection (2).

*Model Code of Pre–Arraignment Procedure* § SS 230.6 commentary at 530.

reveal very "intimate areas" of a person's life. *Opperman,* 428 U.S. at 380 n. 7, 96 S.Ct. at 3102–03 n. 7 (Powell, J., concurring). Justice Powell listed letters and checkbooks as two examples of items that "touch upon intimate areas of an individual's personal affairs." *Id.* Justice Powell concluded, however, that the police in *Opperman* merely searched for and removed for storage "miscellaneous papers," a checkbook, an installment loan book, and a social security card without examining their contents and so concurred with the majority opinion that the search in that case was valid.[7] *Id.*

More recently, the United States Supreme Court has reiterated this limitation on inventory searches stating:

> [A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence. The policy or practice governing inventory searches should be designed to produce an inventory. The individual police officer must not be allowed so much latitude that inventory searches are turned into "a purposeful and general means of discovering evidence of crime."

*Florida v. Wells,* 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990) (quoting *Colorado v. Bertine,* 479 U.S. 367, 376, 107 S.Ct. 738, 743, 93 L.Ed.2d 739 (1987) (Blackmun, J., concurring)); *see also Commonwealth v. Sullo,* 26 Mass.App.Ct. 766, 532 N.E.2d 1219, 1221 (1989) (police prohibited from hunting for information, sifting or reading materials taken from arrestee);[8] *Waine v. State,* 37 Md.App. 222, 377 A.2d 509, 517 (1977) (holding officers went beyond scope of reasonable inventory search in reading papers among defendant's personal effects).

In this case, the State does not dispute that Detective Finch was not permitted to read in detail papers seized as part of an inventory search, but responds that Detective Finch "did not read each piece of paper in the detail Justice Powell in *Opperman* warned against." The State maintains that Detective Finch only viewed each paper sufficiently to ascertain its identity.

D'Antorio argues that Detective Finch exceeded the permissible scope of an inventory search by reading the documents she seized during her inventory. In support of this assertion D'Antorio points to Finch's testimony at trial:

Q: The documents that you testified about in front of you listed in this state's 44 through 55, you said that they appeared to be (indiscernible - away from microphone) type of documents or the documents which you inventoried. Do you recall that testimony?

A: Yes, I do.

Q: When you were looking through those documents did—did Michael D'Antor—the name Michael D'Antorio appear in them?

A: Yes, it did.

Q: On what type of basis? Seldom, frequently.

A: Frequently.

D'Antorio argues that Detective Finch's own words "make crystal clear that she read each document in such detail that she knew that Mr. D'Antorio's name frequently appeared in the documents." D'Antorio further argues that for Finch to be able to

---

7. In his commentary on the *Opperman* decision Professor LaFave concluded:

> In *Opperman,* the police, when they looked in the glove compartment, also found "miscellaneous papers" (a checkbook, an installment loan book, and a social security status card), which, so far as the record indicates, they removed without examination. *Opperman* thus should not be read as authorizing examination of such documents. Rather, the case quite conclusively indicates that a majority of the Court would not approve of such a practice as part of the routine vehicle inventory process.

3 Wayne R. LaFave, *Search and Seizure* § 7.4(a), at 560 (3d ed. 1996).

8. The court also quoted Professor LaFave's commentary:

> It is to be doubted, however, whether inventory justifies scrutiny of particular items beyond that necessary to identify them in an inventory list, and thus a close or complete reading of documents or letters beyond that necessary to determine their general character would be improper.

*Sullo,* 532 N.E.2d at 1222 n. 5 (quoting 2 Wayne R. LaFave, *Search & Seizure* § 5.3(a), at 482 n. 30 (2d ed. 1987)).

testify that the main thrust of the newspaper articles was obituaries, she must have read them. Finally, D'Antorio refers to Finch's testimony at trial that she reviewed each document in enough detail to obtain the "general gist" of each item and argues that "[t]he only way to know the 'gist' of what a written paper contains is to read it."

The record developed in the trial court does not make clear the precise scope of Finch's vehicle search, despite a specific direction on remand from the court of appeals to determine the "scope of Detective Finch's inventory and a comparison of that search with the subsequent search by Stauber." *D'Antorio I*, 837 P.2d at 733. In its findings on remand the superior court noted that:

> [Detective Finch] testified that she opened every container found in the car and looked at each piece of paper. She said that she "glanced" through each one "enough to note that it was an application or obituary or whatever kind of article it was."

The trial court commented that "Detective Finch had only perused the papers sufficiently to know the nature of each one, but not necessarily its precise contents and evidentiary import." [9] Yet, the superior court also found that Detective Finch "examined item by item" D'Antorio's "personal papers," and that Sergeant Stauber's detailed examination "did not materially exceed the scope" of Finch's inventory search. In *D'Antorio II*, the court of appeals held that the superior court "could properly have found that Detective Finch had looked at each document." *D'Antorio II*, Memorandum Opinion and Judgment No. 2961 at 6.

However, as the first question in our order granting D'Antorio's petition for hearing implies and as we explain further in part III below, we do not need to decide the precise extent of Detective Finch's inventory. Based on the cases cited above, we conclude that it would not have been permissible for Detective Finch to read the papers she found as part of her inventory search of D'Antorio's automobile in detail, as the State concedes

Sergeant Stauber did. Such a reading goes beyond what is required to protect the owner's property, to protect the police against claims or disputes over lost or stolen property, or to protect the police from danger. *See Opperman*, 428 U.S. at 378–80, 96 S.Ct. at 3101–03 (Powell, J., concurring). Instead, a detailed reading of the papers constitutes a serious intrusion of D'Antorio's reasonable expectation of privacy and could not be sustained under the inventory exception. *See id.* at 379–80, 96 S.Ct. at 3101–03 (Powell, J., concurring).

2. *Detective Finch's detailed examination of the credit cards did not exceed the permissible scope of an inventory search under federal and Ohio law.*

D'Antorio also argues that Detective Finch exceeded the permissible scope of an inventory search by reading the names on the credit cards seized during her inventory. The State responds that because credit cards have considerable value, police should list the credit cards and the names on them in order to protect themselves from claims that cards were lost, stolen or improperly used while a vehicle was impounded. *See State v. Callaway*, 106 Wis.2d 503, 317 N.W.2d 428, 436 (1982), *cert. denied*, 459 U.S. 967, 103 S.Ct. 294, 74 L.Ed.2d 277 (1982) ("Such credit cards are becoming a necessary hazard of life in our plastic society, although significant financial loss can result from the theft and use of the cards by an unauthorized person."). A review of the jurisdictions that have addressed the issue of proper inventory procedure for credit cards demonstrates a widespread recognition of the validity of the State's position.

In *United States v. Pace*, 898 F.2d 1218, 1243 (7th Cir.), *cert. denied*, 497 U.S. 1030, 110 S.Ct. 3286, 111 L.Ed.2d 795 (1990), the court upheld an inventory search where police "leaf[ed] through the pages of . . . record books . . . to determine whether any items, such as credit cards, might be stuck between the pages." The court concluded that the inventory was conducted pursuant to police

---

**9.** The trial court refused, however, to reexamine the constitutionality of Detective Finch's inventory.

procedure and "is analogous to inventorying the closed container in *Bertine*." *Id.*

Further, in *U.S. v. Andrews*, 22 F.3d 1328, 1335 (5th Cir.1994), the court upheld a similar search, stating:

Andrews contends, however, that a Fourth Amendment violation occurred because the "page-by-page search of [his] notebook was not mandated or allowed by any policy of the Moss Point Police Department." We disagree, because it appears that MPPD's policy *did* allow Adams to open Andrews' notebook, in order to determine whether it contained personal property which should have been included on an MPPD inventory form. Opening a notebook, to determine whether valuables might be found between its pages, is consistent with the MPPD policy requiring an inventory search to protect the city from claims of lost property. Cash, credit cards, negotiable instruments, and any number of other items could be hidden between the pages of a notebook, and could give rise to a claim against the city if lost.

(footnotes omitted); *see also United States v. Khoury*, 901 F.2d 948, 959–60 (11th Cir.) ("[The agent's] initial inspection of the notebook was necessary and proper to ensure that there was nothing of value hidden between the pages," but further action in reading what was written within notebook was beyond inventory purpose and illegal), *modified on other grounds*, 910 F.2d 713 (11th Cir.1990).

▪ Detective Finch completed a detailed inventory of the credit cards in accordance with her department's procedures. When questioned about the inventory procedures for such items as credit cards, Detective Finch testified that "[a]nything that's negotiable like a credit card, a check, cash money, it's placed into baggies—Ziplock baggies and marked for evidence because those kind of items go in the safe." Detective Finch further testified that the credit cards inventoried were "listed like Master Card and the person's name, the number on the card, and then there were Xeroxed pictures taken of the credit card prior to them being put into the safe."

We conclude that the scope of Detective Finch's inventory of the credit cards was reasonable given the interests of the state in protecting the owner's property while it remains in police custody, as well as in protecting the police against claims and disputes over lost or stolen property. Recording the name and number appearing on a credit card seized during an inventory effectively serves these interests. A less comprehensive inventory procedure could potentially expose the police to liability resulting from claims of lost credit cards. Furthermore, this information declares itself on sight to an officer conducting the inventory [10] and does not involve "general rummaging in order to discover incriminating evidence." *Florida v. Wells*, 495 U.S. 1, 4, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990).

Detective Finch's inventory of petitioner's credit cards did not exceed the permissible scope of an inventory search under federal and Ohio law. We therefore affirm the court of appeals' decision on this issue.

**B.** *Under the "Second Glance" Doctrine, Sergeant Stauber's Warrantless Search of the Credit Cards Was Valid but His Search of the Papers Was Not.*

The court of appeals concluded that once D'Antorio's papers and credit cards had been inventoried, he did not retain a significant expectation of privacy in them. *D'Antorio II*, Memorandum Opinion and Judgment No. 2961 at 10. The court of appeals, relying on our decision in *Griffith v. State*, 578 P.2d 578 (Alaska 1978), therefore held that Sergeant Stauber could permissibly conduct a detailed reading of the papers and credit cards under the "second glance" doctrine. *Id.*

In *Griffith*, we stated that the "second glance" doctrine permits police in certain limited circumstances to return to seize items from an incarcerated person's property. 578 P.2d at 580. Griffith was wearing a brown

---

**10.** *See Commonwealth v. Sullo*, 26 Mass.App.Ct. 766, 532 N.E.2d 1219, 1221–22 (1989) ("[P]olice are not required to blind themselves to information appearing on a paper or card that declares its nature to anyone at sight, such as a driver's license or credit card.").

knit turban cap when he was arrested, and it was placed, along with his other personal belongings, in a canvas bag which was stored in a property locker. *Id.* at 579. At the time the victim described the defendant, he noted to the police officer that the defendant was wearing a brown knit turban cap at the time of the robbery. *Id.* When Griffith later challenged the victim's identification of him during a suppression hearing, the arresting officer realized that the cap might have evidentiary value. *Id.* At the arresting officer's request, a booking officer searched Griffith's belongings and located the cap which was held at the jail for the officer. *Id.* at 579–580.

We upheld this second search of the defendant's belongings, stating that "no invasion of privacy occurred" when an officer went through inventoried items to verify the availability of a cap which was in plain view at the time of the defendant's arrest. *Id.* at 580. In so doing, we relied on the following language from *United States v. Grill,* 484 F.2d 990 (5th Cir.1973), *cert. denied,* 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974):

> The underpinning of these cases is that the items in question have been exposed to police view under *unobjectionable circumstances,* so that no reasonable expectation of privacy is breached by an officer's taking a second look at matter with respect to which [the] expectation of privacy already has been at least partially dissipated.

*Id.* at 991, *cited in Griffith v. State,* 578 P.2d at 580 (footnote omitted) (emphasis added).

Importantly, in *Reeves v. State,* 599 P.2d 727 (Alaska 1979), we also noted our agreement with the following statement from *Brett v. United States,* 412 F.2d 401, 406 (5th Cir.1969): "We are not prepared to say that an accused whose effects are held by the police for safekeeping has, by the single fact alone of the police custody of the property, surrendered his expectations of the privacy of those effects." *Reeves,* 599 P.2d at 734 n. 18.

■ Based on the foregoing, we hold, as did the court of appeals in *D'Antorio I,* 837 P.2d at 733, that police are permitted a "second glance" equal in scope and intensity to their first lawful view of the property. Thus, a "second glance" may be sustained only if it is no more penetrating than the initial search and the initial search is constitutionally valid.

■ Therefore, we affirm the holding of the court of appeals that Sergeant Stauber's search of the credit cards was valid under the "second glance" doctrine. The credit cards were properly inventoried by Detective Finch and Sergeant Stauber's "second glance" was no more intensive than Detective Finch's inventory.

■ Sergeant Stauber's search of the papers, however, was not permissible under the "second glance" doctrine. While the parties contest the extent to which Detective Finch examined the papers in question, it is uncontested that, without a warrant, Sergeant Stauber went through each paper, read it, copied it, and described it on a detailed index. If Detective Finch merely glanced at the documents for the purposes of identifying them, then Sergeant Stauber's examination significantly exceeded the initial search in scope and intensity and was not valid under the "second glance" doctrine. *D'Antorio* still retained an expectation of privacy in the contents of the documents in question that was not dissipated by an inventory merely indicating their existence.[11]

■ If, on the other hand, Sergeant Stauber's examination merely repeated De-

---

11. *See State v. Davis,* 154 Ariz. 370, 742 P.2d 1356 (Ariz.App.1987). In *Davis* the Arizona Court of Appeals suppressed a diary lawfully seized during an inventory search, but later read without a warrant. The court concluded:

> The actions of the detective in removing the diary from the police property room and in reading and copying its contents several days after appellant was arrested and her possessions inventoried can hardly be said to be an "incidental administrative step." Inventory searches may not be conducted for the purpose of discovering evidence of a crime. It is apparent that the diary reading was aimed at obtaining evidence rather than inventorying appellant's property. The search, therefore, was not justified under that exception to the search warrant requirement.

*Id.* 742 P.2d at 1361 (citation omitted); *Khoury,* 901 F.2d at 958 (subsequent warrantless inspection of a diary following valid inventory constitutes violation of Fourth Amendment).

tective Finch's, then her initial search, as explained above, exceeded the limits of the inventory exception to the warrant requirement. In that case, Sergeant Stauber's search would also be invalid since there can be no permissible "second glance" at items initially exposed to police as a result of an unconstitutional search. As D'Antorio correctly argues, to hold otherwise would effectively eliminate the prohibition on close reading of papers during inventory searches.[12] We therefore reverse the holding of the court of appeals that Sergeant Stauber's warrantless examination of the papers was a valid "second glance."

### C. The Admission of the Documents Seized in Ohio Was Not Harmless Error.

The State argues that even if there was error in the admission of any or all of the evidence seized from D'Antorio in Ohio, the error was harmless. The State lists numerous pieces of evidence which allegedly link D'Antorio to the scheme to defraud, asserting that the jury was provided with an overwhelming amount of evidence from sources other than the inventory of the car in Ohio. The State asserts that in the face of this "overwhelming amount of evidence," any error in admission of the Ohio evidence is harmless beyond a reasonable doubt.

In *D'Antorio I*, the court of appeals instructed the superior court to decide on remand whether introduction of this evidence was harmless error. The superior court concluded that this

issue is the easiest to resolve. The court agrees with defendant that considerable emphasis was placed on the materials found in Huber Heights. The question is not whether there may have been sufficient evidence to support the jury's verdict without some or all of the Ohio materials that were introduced. The issue is whether there is a possibility that this evidence may have "appreciably affected" the jury's verdict. *Kristich v. State*, 550 P.2d 796

(Alaska 1976). The court finds that such [a] possibility exists. The state has not established beyond a reasonable doubt that any error was harmless.

D'Antorio points to the closing arguments where the State argued:

It was an investigator's dream what happened in Huber Heights, Ohio. It was not one piece of evidence that ties him to Mockingbird Lane and shows—puts his signature on—on this case entirely, there's reams of it.... [F]or the defense to argue that it wasn't him doing it is completely obliterated by all this evidence that was discovered on him in Huber Heights, Ohio.

 We hold that the record supports the superior court's finding that the documents in question may have "appreciably affected" the jury's verdict. We therefore affirm the superior court's holding that any error in the admission of the documents seized in Ohio was not harmless beyond a reasonable doubt. *See Chapman v. California*, 386 U.S. 18, 23–24, 87 S.Ct. 824, 827–28, 17 L.Ed.2d 705 (1967) (adopting rule that constitutional error in admitting evidence must be shown harmless beyond reasonable doubt).

### IV. CONCLUSION

For the foregoing reasons, we conclude that it was not permissible under federal and Ohio law for Detective Finch to read in detail the personal papers which she seized during her search conducted in Huber Heights, Ohio. Sergeant Stauber's warrantless examination of these papers therefore cannot constitute a valid "second glance" since it either impermissibly exceeded the scope of the initial inventory search or repeated an unconstitutional search.

We further conclude, however, that Sergeant Stauber's examination of the credit cards was valid under the "second glance" doctrine. His search did not exceed in scope or intensity the lawful listing and copying of

---

**12.** The State argues that Sergeant Stauber's search was a valid "second glance" because, unlike Detective Finch, he recognized the evidentiary value of the papers without having to read them in detail. This argument misses the issue

on appeal. Sergeant Stauber did in fact read the papers in detail. His suspicions concerning the possible evidentiary value of the papers do not justify a warrantless search.

the credit cards Detective Finch conducted as part of her inventory search.

We hereby REVERSE D'Antorio's conviction and REMAND for a new trial.