OPINION
This appeal arises out of a robbery and shooting which occurred at the Lev's Pawn Shop located at 2404 West Broad Street in Columbus, Ohio, on July 29, 1999. On September 17, 1999, the Franklin County Grand Jury indicted defendant-appellant, Kenneth M. Tucker, on one count of aggravated murder, in violation of R.C. 2903.01, in connection with the death of Lev's Pawn Shop employee, Phelix Pisman; two counts of attempted aggravated murder, in violation of R.C. 2903.02 and 2903.01, in connection with the shooting of Lev's Pawn Shop employee, Andrew Fisher; and one count of aggravated robbery, in violation of R.C. 2911.01. The aggravated murder count carried two death penalty specifications: (1) that the offense was part of a course of conduct involving the purposeful killing or attempt to kill two or more persons as set forth in R.C.2929.04(A)(5); and (2) that the offense was committed while defendant was committing, attempting to commit, or fleeing immediately after committing or attempting to commit aggravated robbery, and either that defendant was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design as set forth in R.C. 2929.04(A)(7). In addition, all four counts of the indictment carried firearm specifications.
Beginning on April 17, 2000, defendant was tried before a jury on the four counts in the indictment. In brief, the state's evidence was sufficient to establish the following: During the summer of 1999, defendant, an escaped fugitive wanted in Pennsylvania for escape and other charges unrelated to this appeal, was living in Columbus, Ohio. Toward the end of July 1999, defendant moved into the home of Bonnie Williams, a relative of a woman that defendant was seeing. Bonnie Williams' home is located on West Broad Street, less than two blocks from Lev's Pawn Shop.
Defendant spent the morning of July 29, 1999, at Bonnie Williams' home watching television with Bonnie Williams' son, Connie Williams. A little before 11:00 a.m., defendant left the Williams' home, ostensibly to buy beer. Defendant did not return for four or five days.
On the morning of July 29, 1999, Lev's Pawn Shop at 2404 West Broad Street was staffed by Phelix Pisman and Andy Fisher. At around 10:45 a.m., Fisher left the pawnshop to get coffee and snacks at a nearby convenience store, leaving Pisman alone in the pawnshop. The front door of the pawnshop had an electric security lock that prevented the door from being opened unless someone on the inside pushed a button behind the counter that unlocked the door. Further, in order to get the door to close and relock after someone entered the store, the button had to be pushed while the door closed. If the button was not pushed when the door closed, the door would remain unlocked.
When Fisher returned to the pawnshop five or ten minutes later, he knocked on the door so that Pisman would unlock it. However, instead of seeing Pisman inside the shop, Fisher saw defendant standing in front of the counter. When Fisher knocked on the door, defendant reached over the counter and pressed the button to unlock the door. However, because defendant did not know that he had to keep his finger on the button in order for the door to relock, once Fisher opened the door defendant let up on the button. As a result, when the door closed behind Fisher, it did not lock. Once inside, Fisher asked defendant what he was doing reaching over the counter. Defendant responded by pointing a .22 caliber revolver at Fisher and telling him to "shut up." Fisher also noticed that one of the display counters was open and there was jewelry missing from the counter.
At gunpoint, defendant forced Fisher around the counter toward the office. Once inside the office, Fisher saw Pisman lying on the floor with his eyes open. Pisman's blood was splattered on the office safe, which was open. Defendant ordered Fisher to give him the money in the cash register. When Fisher complied, defendant complained because the money in the register amounted to only about $200. In order to keep defendant from shooting him, Fisher gave defendant the approximately $200 that he was carrying.
Defendant next ordered Fisher to let him out through the back of the shop. The rear door to the shop was a garage door, with a locked security gate on the inside. Fisher got the keys to the gate and door, and proceeded to the doors. When they got to the doors, defendant ordered Fisher to get on his knees. Fisher begged defendant not to shoot him, telling defendant that he had a four-year-old son he wanted to see grow up. However, once Fisher had unlocked and opened the security gate and garage door, defendant shot Fisher once in the back of the head and fled. Fisher testified that he heard a gunshot, saw his body hit the floor, and then from his position on the floor, watched defendant run away down the alley behind the pawnshop.
Roughly, one hour later, Ruth Goggans stopped at the pawnshop to see if she could sell a flute for her daughter. Because defendant had not caused the front door to relock after letting Fisher in, Goggans was able to open the door and enter the store without help from inside. Once inside the pawnshop, Goggans discovered Pisman lying in a pool of blood. She then called 911 and her daughter flagged down a passing ambulance.
While the medics, whom Goggans' daughter had flagged down, were working on Pisman, several officers from the Columbus Police Department ("CPD") arrived on the scene. In the course of sweeping the building for suspects, the police discovered Fisher in the back of the shop. Both Pisman and Fisher were transported to the hospital. Pisman was pronounced dead at the hospital. Fisher survived, but continues to require medication and physical therapy to reduce or alleviate the effects of the brain injury caused by the gunshot wound to his head.
The day after the robbery and shooting at Lev's Pawn Shop, defendant met Lynn Ashford, a woman he knew from Pennsylvania, in Columbus, Ohio. The two spent the night together in a hotel and defendant gave Ashford some jewelry he had stolen from the pawnshop. Ashford visited defendant in Columbus two more times during August 1999.
On July 31, 1999, defendant's escape from Pennsylvania authorities was featured on the television program "America's Most Wanted." Bonnie Williams watched this program and became suspicious of defendant. As a result, she went through some of defendant's luggage. Inside one of defendant's bags, Williams found a copy of a wanted poster with a photograph of defendant that matched a photograph shown on "America's Most Wanted." Williams then contacted Pennsylvania authorities. As a result of the information supplied by Williams, a team lead by FBI Agent Tim Creedon arrested defendant on a fugitive warrant at the Williams home on August 29, 1999. At the time of defendant's arrest, the FBI also seized defendant's luggage and a number of other miscellaneous items that defendant indicated belonged to him. Later, the FBI subjected defendant's personal property to an inventory search pursuant to its written policy and stored the property in its property room pending defendant's expected extradition to Pennsylvania.
Shortly after defendant was taken into custody on the fugitive warrant, CPD's Automated Fingerprint Identification System indicated that there was a potential match between the fingerprints taken from defendant following his arrest by the FBI and several prints found in the Lev's Pawn Shop. A subsequent manual review of the prints confirmed the initial match. As a result of the fingerprint match, CPD Detective Patrick Dorn, the lead investigator on the pawnshop shooting, met with FBI Agent Creedon to see if he could learn anything more about defendant. During this meeting, Agent Creedon went to the FBI property room and retrieved several of the miscellaneous pieces of property that had been seized during defendant's arrest and showed them to Detective Dorn. Among the items that Agent Creedon showed Detective Dorn, was a pawnshop receipt for several pieces of jewelry made out to Lynn Ashford. This pawnshop receipt proved to be important to CPD's investigation of the shooting and robbery at Lev's Pawn Shop, as the receipt ultimately led to the discovery that Ashford had sold jewelry given to her by defendant at several pawnshops in Columbus and Philadelphia, and that all of the jewelry sold by Ashford had been stolen from Lev's Pawn Shop.
John L. Muncy, who had shared a twelve-man jail cell at the Franklin County Jail with defendant following defendant's arrest on the fugitive warrant, testified that one evening he overheard defendant tell another unidentified inmate about a pawnshop robbery he had committed. According to Muncy, defendant told the other inmate that he had to get the person inside the pawnshop to "buzz" him in through the locked front door of the shop. Defendant also stated that something had gone wrong during the robbery and he had shot one man and had attempted to kill another younger man. Defendant described how the younger man had begged for his life, but defendant stated that he shot the man in the head anyway because he did not want to leave any witnesses. According to Detective Dorn, the information about Fisher having begged for his life before being shot had not been made public, and would have been known only to Fisher, the police, and the shooter.
On May 2, 2000, the jury found defendant guilty on all counts and specifications contained in the indictment. On May 16 and 17, 2000, the trial court held a mitigation hearing pursuant to R.C. 2929.03. At the close of the hearing, the jury returned a verdict finding that the aggravating circumstances were not sufficient to outweigh the mitigating factors. The jury then recommended that defendant be sentenced to life in prison without the possibility of parole. Following an independent review of the evidence presented at the mitigation hearing, the trial court accepted the jury's recommendation and sentenced defendant to life in prison without the possibility of parole on the aggravated murder count, ten years of imprisonment on the two counts of attempted aggravated murder, which were merged for sentencing, and ten years on the aggravated robbery count. The trial court also ordered that the sentences for attempted aggravated murder and aggravated robbery be served consecutively to the life sentence for aggravated murder.
Defendant appeals from the trial court's final judgment of conviction and sentence assigning the following errors:
FIRST ASSIGNMENT OF ERROR
 THE TRIAL COURT VIOLATED EVID. R. 404(B) AND 403(A), AS WELL AS MR. TUCKER'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE ONE
OF THE OHIO CONSTITUTION, WHEN IT OVERRUED MR. TUCKER'S OBJECTIONS TO OTHER ACTS EVIDENCE.
 SECOND ASSIGNMENT OF ERROR THE TRIAL COURT ABUSED ITS DISCRETION AND VIOLATED MR. TUCKER'S RIGHTS TO BE FREE FROM UNREASONABLE SEARCHES AND SEIZURES AND TO DUE PROCESS AND A FAIR TRIAL UNDER THE FOURTH, FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 14 AND 16, ARTICLE ONE OF THE OHIO CONSTITUTION WHEN IT OVERRULED MR. TUCKER'S MOTION TO SUPPRESS ALL EVIDENCE OBTAINED IN AND DERIVED FROM THE SEARCH AND SEIZURE OF HIS PERSONAL BELONGINGS.
 THIRD ASSIGNMENT OF ERROR THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED MR. TUCKER HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 16, ARTICLE ONE
OF THE OHIO CONSTITUTION WHEN IT OVERRURLED MR. TUCKER'S OBJECTION TO THE UNRELIABLE IN-COURT IDENTIFICATION BY ANDREW FISHER.
 FOURTH ASSIGNMENT OF ERROR THE TRIAL COURT DENIED APPELLANT HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL, AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION 16 OF THE OHIO CONSTITUTION, BY OVERRULING HIS MOTION FOR A MISTRIAL DUE TO A SPECTATOR OUTBURST AT THE CONCLUSION OF THE STATE'S REBUTTAL CLOSING ARGUMENT IN THE MITIGATION PHASE.
 FIFTH ASSIGNMENT OF ERROR THE PROSECUTION ENGAGED IN A PATTERN OF MISCONDUCT THAT WAS PREJUDICIAL AND DENIED MR. TUCKER HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSITITUTION AND SECTION 16, ARTICLE ONE OF THE OHIO CONSTITUTION.
 SIXTH ASSIGNMENT OF ERROR THE TRIAL COURT ABUSED ITS DISCRETION, DENIED THE ACCUSED A FAIR TRIAL, THE RIGHT TO COUNSEL, AND THE OPPORTUNITY TO PRESENT MITIGATING EVIDENCE BY DENYING THE ACCUSED'S MOTION FOR CONTINUANCE OF THE TRIAL. THE DENIAL OF A REASONABLE CONTINUANCE VIOLATED MR. TUCKER'S HIS [SIC] RIGHTS TO COUNSEL, TO DUE PROCESS, AND A FAIR TRIAL UNDER THE FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTIONS 10 AND 16, ARTICLE ONE OF THE OHIO CONSTITUTION.
 SEVENTH ASSIGNMENT OF ERROR MR. TUCKER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND SECTION 10, ARTICLE ONE OF THE OHIO CONSTITUTION.
For organizational purposes, we will address appellant's assignments of error out of order, beginning with his second assignment of error. In his second assignment of error, defendant challenges the trial court's denial of his motion to suppress the pawnshop receipt and all evidence derived therefrom as having been obtained in violation of theFourth Amendment.
On appeal, defendant has challenged only Agent Creedon's and Detective Dorn's second search of the pawnshop receipt, which occurred several days after the FBI conducted the inventory search of defendant's belongings. The pawnshop receipt is noted on the inventory form of the FBI. Defendant has not challenged the FBI's seizure of the pawnshop receipt from the Williams' home, or the FBI's initial examination of the pawnshop receipt as part of its inventory search of his belongings.
Because the material facts surrounding the warrantless second search of the pawnshop receipt are not in dispute, the trial court's decision to deny defendant's motion to suppress involves only a question of law, which we review de novo. State v. Russell (1998), 127 Ohio App.3d 414,416; Ornelas v. United States (1996), 517 U.S. 690, 699, 116 S.Ct. 1657. Initially, defendant takes issue with the trial court's failure to provide either findings of fact or any explanation for its denial of his motion to suppress. Because defendant's motion to suppress raised only legal issues, the trial court was not required to place its findings of fact or conclusions of law on the record. State v. Elkins (1984), Cuyahoga App. No. 47319.
The Fourth Amendment to the United States Constitution protects people against unreasonable searches and seizures. However, in so doing, theFourth Amendment protects only "reasonable expectations of privacy." Rakas v. Illinois (1978), 439 U.S. 128, 99 S.Ct. 421. Consequently, the issue raised by defendant's second assignment of error is whether an individual whose property is taken during his arrest retains a reasonable expectation of privacy in that property while it is in police custody. Although this issue appears to be one of first impression in Ohio, a number of other jurisdictions have addressed the issue.
The United States Supreme Court case that most closely addresses the issue with which we are faced is United States v. Edwards (1974),415 U.S. 800, 94 S.Ct. 1234. In Edwards, the defendant was arrested and taken into police custody shortly after 11:00 p.m. on a charge of attempting to break into a post office. Subsequent investigation done at the scene revealed that the perpetrator had attempted to enter the building by prying a window open, which had left paint chips on the windowsill and screen. The next morning, defendant's clothing was taken from him by police. Examination of the clothing revealed paint chips that matched those found on the windowsill and screen of the post office. The chips found on the defendant's clothes were then used as evidence against the defendant. Id. at 801-802. In upholding the trial court's decision to admit the evidence obtained from the defendant's clothing, the Supreme Court stated:
 * * * [O]nce the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. * * * [Id. at 807.]
The Supreme Court's holding in Edwards is grounded in the greatly reduced expectation of privacy one holds in his person after being placed under arrest. United States v. Burnette (C.A.9, 1983), 698 F.2d 1038,1049. Relying on Edwards, several courts have held that an individual who has been lawfully arrested also has a diminished expectation of privacy in any property that the police have lawfully seized from him. Lockhart v. McCotter (C.A.5, 1986), 782 F.2d 1275, 1280; Burnette, supra; State v. Jones (Wis.App. 1993), 510 N.W.2d 784, 787; Ex parte Hilley (Ala. 1986), 484 So.2d 485, 489.
It is the extent to which an individual's reasonable expectation of privacy in his property has been diminished that defines the permissible scope of any second search of property that is in police custody. In turn, the extent to which an individual's expectation of privacy in property in police custody has diminished is determined by the permissible scope of any initial search of the property. State v. Betterley (Wis. 1995), 529 N.W.2d 216, 220. See State v. Mejia (Fla.App. 1991),579 So.2d 766, 767 (holding that, where a defendant's wallet is searched as part of a search incident to the defendant's arrest, a second search of the wallet to retrieve newspaper clippings from the wallet did not require a warrant, as the second search was within the lawful scope of a search incident to arrest). The rationale underlying this rule is that, once property has been exposed to police view under lawful circumstances, no reasonable expectation of privacy is breached by the police taking a second, no more intrusive, look at the same property while it remains in their custody. D'Antorio v. State (Alaska 1996),926 P.2d 1158, 1166. Accordingly, where police conduct an initial inventory search of a defendant's belongings and later look at an inventoried item a second time, the second search does not require a warrant so long as it falls within the lawful scope of the initial inventory search. Betterley, at 220-221 (holding that police officer's warrantless second look at a ring that had been inventoried and placed in safekeeping after having been found on the defendant at the time of his arrest, did not violate the Fourth Amendment). But cf. D'Antorio, supra (holding that police officer's warrantless second, much more detailed examination of documents that had been inventoried and placed in safekeeping after having been found in defendant's car at the time of his arrest, did violate the Fourth Amendment).
In the present case, Agent Creedon's and Detective Dorn's second search of the pawnshop receipt consisted of a simple examination of the object. Thus, the second search was no more intrusive than a lawful inventory search. Further, the fact that Agent Creedon belonged to a different law enforcement agency than the individual who first examined the pawnshop receipt, or that the second search was related to a different crime than that which led to the initial search, does not change the analysis. See United States v. Thompson (C.A.5, 1988), 837 F.2d 673 (holding that federal agents' second search of keys which had been inventoried by local law enforcement officers is not violative of Fourth Amendment even though federal agents were investigating a crime which was unrelated to the defendant's initial arrest).
Based on the foregoing discussion, we conclude that the trial court did not err in denying defendant's motion to suppress the pawnshop receipt and other evidence that the state derived from the receipt. Defendant's second assignment of error is overruled.
In his third assignment, defendant asserts that the trial court erred when it overruled his objection to the admission of Fisher's in-court identification of defendant as the man who shot him.
Unreliable identification testimony is excludable under the Due Process Clauses of the United States Constitution. State v. Salwan (1996), Cuyahoga App. No. 68713. In the context of eyewitness identification testimony, "[i]t is the likelihood of misidentification which violates a defendant's right to due process[.]" Neil v. Biggers (1972), 409 U.S. 188,198, 93 S.Ct. 375. The critical inquiry is "whether under the `totality of the circumstances' the identification was reliable." Biggers, at 199. The factors to be considered in determining whether identification testimony is reliable include: the opportunity of the witness to view the criminal at the time of the crime; the witness' degree of attention; the accuracy of the witness' prior description of the criminal; the level of certainty demonstrated at the confrontation; and the time between the crime and the confrontation. The corrupting effect of any suggestive identification procedure must then be weighed against these factors. Manson v. Brathwaite (1977), 432 U.S. 98, 114-116, 97 S.Ct. 375. Applying this analysis to Fisher's in-court identification of defendant, we conclude that Fisher's identification was sufficiently reliable to have been admitted.
Initially, we do not believe that the photo array was unnecessarily suggestive simply because defendant's photo was placed in the upper right-hand corner of the first of six pages of photographs, as defendant contends. Nor do we believe that the fact that Fisher saw defendant on television shortly after he was arrested on the fugitive warrant was so suggestive that it required the exclusion of Fisher's in-court identification.
Nonetheless, the record does reveal a number of issues that cast doubt on the reliability of Fisher's in-court identification. First, Fisher's in-court identification of defendant did not occur until more than eight months after Fisher was shot. In Biggers, the United States Supreme Court indicated that seven months between the identification and the crime was a "negative factor" in determining whether identification testimony was reliable. Id. at 200. More troubling, however, is the fact that Fisher was unable to pick defendant's photograph out of the array when it was shown to him a little less than a month after the shooting. Clearly, this cast some doubt on the reliability of Fisher's in-court identification of defendant almost nine months later. However, several other factors support the admissibility of Fisher's in-court identification. The record reveals that Fisher had at least several minutes to view his assailant during the crime. In addition, Fisher testified that he made a special effort to get a good look at his assailant's face so that he would be able to identify him later. Specifically, Fisher testified that, even after he was on his knees, he kept "trying to look back and see his [assailant's] face" so that he could remember it. While not clear as to the timing from the record, it appears that Fisher may have been affected by the trauma of his head injury at the time he viewed the photo array. Yet his physical description of his assailant was not markedly different than his actual appearance. Finally, Fisher was very certain of his in-court identification of defendant as the person who shot him.
While defendant has raised some legitimate concerns about the reliability of Fisher's in-court identification, considering the totality of the circumstances we conclude that Fisher's identification was sufficiently reliable that its admission did not violate defendant's due process rights. Accordingly, the issues raised by defendant regarding the reliability of Fisher's identification testimony go to the weight to be given to the testimony, rather than to its admissibility. State v. Wills (1997), 120 Ohio App.3d 320, 325.
Defendant's third assignment of error is overruled.
In his first assignment of error, defendant contends that the trial court erred in overruling his objections to the prosecution's discussion of the fact that defendant appeared on a wanted poster and was featured on the television program "America's Most Wanted" during its opening statement and to the prosecution's subsequent elicitation of testimony from Bonnie Williams regarding defendant's appearances on the wanted poster and "America's Most Wanted." Specifically, appellant argues that the information regarding his appearances on a wanted poster and on "America's Most Wanted" constituted inadmissible "other acts" evidence under Evid.R. 404(B).
Preliminarily, a trial court has broad discretion to admit or exclude evidence, and its determination will not be reversed absent an abuse of discretion. State v. Sage (1987), 31 Ohio St.3d 173.
Evid.R. 404(B) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." This rule codifies an exception to the common law rule that evidence of previous criminal acts wholly independent of the criminal offense for which a defendant is on trial is generally inadmissible. State v. Wilkinson (1980), 64 Ohio St.2d 308, 315; State v. Broom (1988), 40 Ohio St.3d 277, paragraph one of the syllabus. While evidence of other crimes, wrongs, or acts is not admissible to show the accused's propensity or inclination to commit a crime, it may be admissible for other purposes including to prove motive, intent, plan, or absence of mistake or accident. R.C. 2945.59; Evid.R. 404(B).
To be admissible, "other acts" evidence must form part of the immediate background of the crime charged; that is, the evidence must play an integral part in explaining the sequence of events or the setting of the case and be necessary to give a complete picture of the crime or crimes with which the defendant is charged. State v. Thompson (1981),66 Ohio St.2d 496, 498; Wilkinson, at 317. However, in order to be admissible, the other acts at issue must tend to establish one of the legitimate purposes enumerated in Evid.R. 404(B). See Broom, at paragraph one of the syllabus.
The state contends that the fact that defendant was pictured on a wanted poster and was featured on "America's Most Wanted" were inextricably related to defendant's subsequent shooting of Pisman and Fisher in that they established defendant's fugitive status, which, in turn, tended to establish a possible motive for the shootings. While we agree with the state's position that defendant's motive for the shootings was an issue in the case, and that defendant's fugitive status was relevant to establishing a possible motive, we do not agree that defendant's appearances on the wanted poster and on "America's Most Wanted" were necessary to establishing that status. The testimony of FBI Agent Creedon, whose team executed the fugitive warrant for defendant, more than adequately established that defendant was a fugitive when the crimes for which he was on trial were committed. Thus, the additional information regarding defendant's appearances on a wanted poster and on "America's Most Wanted" simply served to unnecessarily emphasize the seriousness of the crimes for which defendant was a fugitive. Accordingly, that part of the testimony concerning defendant's fugitive status should have been excluded. It is noted, however, that defense counsel, as part of his trial strategy, attempted to use the "America's Most Wanted" episode to attack Muncy's credibility and to bolster defendant's credibility. Thus, it appears that the testimony of the television show would have been presented by the defense in any event. However, the court should have required the state to use a sanitized version until defendant opened the door.
It is well-established that evidentiary errors, including those that rise to the level of constitutional violations, will be deemed harmless where the remaining untainted evidence provides overwhelming proof of the defendant's guilt. State v. Williams (1983), 6 Ohio St.3d 281, 290; State v. Hurt (1996), Franklin App. No. 95APA06-786. In this case, the untainted evidence provides overwhelming proof of defendant's guilt. Defendant's fingerprints were found there, he had the loot taken at the time of the shooting and, faced with that evidence, admitted entering the pawnshop and stealing the goods. Fisher made a positive in-court identification of defendant as the shooter. Muncy testified that he overheard defendant describe his commission of the robbery and shootings, with details unknown to the public. The only contrary testimony is defendant's self-serving and highly improbable claim that some unknown criminal had committed the shootings and fled shortly before defendant entered the pawnshop.
Defendant's first assignment of error is overruled.
In his fourth assignment of error, defendant argues that the trial court erred in failing to grant a mistrial based upon the fact that a member of one of the victim's families began applauding when the prosecutor concluded his rebuttal closing argument during the mitigation phase of the trial.
The question of whether an emotional outburst during a murder trial by a spectator related to the victim has influenced the jury against the accused so as to deprive the accused of a fair trial is a question of fact to be resolved by the trial court. State v. Morales (1987),32 Ohio St.3d 252, 271. It is the trial court which has the opportunity "to gauge the totality of the impact upon the jury of the spectator's demonstration." State v. Bradley (1965), 3 Ohio St.2d 38, 40. The trial court alone is in a position to determine whether the jury was disturbed, alarmed, shocked, or moved by the demonstration. Morales. A trial court's determination with respect to a spectator outburst will not be disturbed on appeal absent clear evidence in the record that the trial court's determination was erroneous. Id.
Here, the record does not reflect the length or severity of the spectator outburst or the effect of the outburst on the jurors. Following the outburst, the trial court concluded that the outburst had not irreparably tainted the jury, admonished the jury not to consider the outburst, and inquired of the jurors as a group whether it had their assurance that they would not consider the outburst. Although the jurors' responses to the court's inquiry do not appear on the record, defendant does not allege that any of the jurors responded in the negative. Because the record contains no evidence that would indicate that spectator outburst irreparably prejudiced the jury against defendant, the trial court's determination will not be disturbed. It is also noted that the jury did not return the death penalty but, rather, a less severe penalty for very egregious crimes.
Defendant's fourth assignment of error is overruled.
In his fifth assignment of error, defendant asserts that he was deprived of his right to a fair trial by a series of actions by the prosecution, which constitute prosecutorial misconduct. Specifically, defendant contends that the following actions by the prosecution constituted prosecutorial misconduct: (1) introducing evidence of defendant's appearances on a wanted poster and on the television show "America's Most Wanted"; (2) asking Andrew Fisher on redirect whether he was aware that the defense investigator was living with one of defendant's trial counsel; (3) presenting a photograph of defendant holding a gun other than the one used in the crime for which he was on trial and several shotgun shells found in defendant's luggage to the jury; (4) failing to notify defense counsel that it had obtained a warrant to search defendant's luggage and belongings and to take a blood sample from defendant, and obtaining said warrant from the municipal court after defendant's case had been assigned to the court of common pleas; (5) suggesting in its closing argument to the guilt phase of defendant's trial that the charges pending against defendant in Pennsylvania gave defendant a motive to kill Pisman and Fisher; (6) characterizing the defense's theory of the case as a "fog" in closing argument; (7) flashing an autopsy photograph of Pisman's brain to the jury during closing argument; and (8) referring to the absence of several mitigating factors which were not raised by the defense during its rebuttal closing argument to the mitigation phase of defendant's trial.
The Ohio Supreme Court recently reiterated the standard for reviewing a claim of prosecutorial misconduct as follows: "`The test for prosecutorial misconduct is whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused.' However, the touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" State v. Hanna, 95 Ohio St.3d 285,2002-Ohio-2221, at ¶ 61. (Citations omitted.)
Several of the actions of the prosecution about which defendant complains may have been error. However, only the prosecution's query of Fisher regarding whether he knew that the investigator for the defense was living with one of the members of the defense team rises to the level of prosecutorial misconduct. See State v. Keenan (1993),66 Ohio St.3d 402, 407 (holding that it is improper to denigrate defense counsel). This inquiry served no legitimate purpose and was plainly intended to impugn the credibility and integrity of defense counsel. Nonetheless, because the evidence of defendant's guilt is so overwhelming, we do not find that the prosecution's misconduct considered individually or collectively affected the fairness of defendant's trial. State v. Fears (1999), 86 Ohio St.3d 329, 336.
Defendant's fifth assignment of error is overruled.
In his sixth assignment of error, defendant argues that he was denied his right to a fair trial, right to counsel, and right to due process of law when the trial court denied his trial counsel's motion for a continuance. The record reflects that the trial court set a trial date of April 7, 2000, for this matter during a status conference held on October 14, 1999. On March 15, 2000, five months after the trial date was set and less than four weeks before the trial was to begin, defendant's trial counsel filed a motion requesting a continuance on the grounds that the defense's mitigation expert would be unable to complete her work by April 7, 2000, and the defense needed more time to investigate discovery, which it had just received. The trial court denied the motion.
Trial courts have broad discretion to decide whether to grant a continuance. State v. Powell (1990), 49 Ohio St.3d 255, 259. Whether a trial court has abused its discretion in denying a motion for a continuance depends upon the circumstances, "particularly * * * the reasons presented to the trial judge at the time the request is denied." Id. (quoting Ungar v. Sarafite [1964], 376 U.S. 575, 589, 84 S.Ct. 841). When reviewing a trial court's refusal to grant a continuance, an appellate court must weigh the potential prejudice against the trial court's right to control its docket and the public's interest in the prompt and efficient justice. Id. "Relevant factors include `the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or * * * dilatory, purposeful, or contrived; [and] whether the defendant contributed to the circumstance which gives rise to the request.'" Id. (quoting State v. Unger [1981], 67 Ohio St.2d 65, 67-68).
In challenging the trial court's denial of his trial counsel's motion for a continuance, defendant alleges that, in months between the original scheduling of the April 2000 trial date and the filing of the motion for a continuance, the trial court incorrectly led his trial counsel to believe that the court's schedule would require the trial date to be rescheduled for June or July 2000. Defendant does not, however, provide any explanation of how defendant was prejudiced by the trial court's failure to grant the continuance. We are provided with no indication of what testimony the "mitigation expert" may have provided to obtain a result better than was obtained.
We are unable to consider defense counsel's claim that the trial court misled them about the trial date, as the claim relies on communications that do not appear on the record. Sachs v. Am. Economy Ins. Co. (1992),78 Ohio App.3d 440, 445. In the absence of any showing of prejudice, we cannot say that the trial court abused its discretion in denying the motion for a continuance.
Defendant's sixth assignment of error is overruled.
In his seventh assignment of error, defendant contends that he was denied his Sixth Amendment right to effective assistance of counsel.
In order to prevail on a claim of ineffective assistance of counsel, a defendant must meet the two-pronged standard outlined in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052. First, he must demonstrate that his counsel's performance was deficient and that counsel's errors were "so serious that counsel was not functioning as the `counsel' guaranteed the defendant by the Sixth Amendment." Id. at 687. Second, defendant must demonstrate that he was prejudiced by his counsel's errors, showing that the "errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." Id. To meet this second prong, defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.
Here, defendant contends that his trial counsel's failure to move for a continuance of his trial date when it first learned that the mitigation expert could not complete his work by April 7, 2000, and failure to assert Evid.R. 403(A) as an alternative ground for its objection to the admission of the information regarding defendant's appearance on a wanted poster and on the television show "America's Most Wanted" constituted ineffective assistance of counsel. It is true that defendant's trial counsel would have been well-advised to have moved for a continuance sooner than three weeks before the scheduled trial date, and to have asserted Evid.R. 403(A) as an additional ground for its objection to the evidence pertaining to the wanted poster and "America's Most Wanted." Nonetheless, defendant suffered no known prejudice as the result of either of these deficiencies. Further, defense counsel's representation must be viewed as a whole. State v. Tucker (2001), Franklin App. No 00AP-1304. Our review of the record leads us to conclude that defendant's trial counsel's performance was, on the whole, exemplary.
Defendant's seventh assignment of error is overruled.
Having overruled each of defendant's seven assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
TYACK, P.J., and DESHLER, J., concur.
McCORMAC, J., retired of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.